**SAMUEL et al. v. UNITED STATES.**

No. 11402.

Circuit Court of Appeals. Ninth Circuit.

Aug. 24, 1948.

Rehearing Denied Oct. 8, 1948.

Leo R. Friedman, of San Francisco, Cal., for appellant Schutz.

Melvin M. Belli and Guernsey Carson, both of San Francisco, Cal., for appellants Samuel, Samuel, and Brown.

Frank J. Hennessy, U. S. Atty., and Reynold H. Colvin, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before GARRECHT, DENMAN, MATHEWS, STEPHENS, HEALY, BONE, and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

This case was heretofore argued and submitted to a panel of this court, and thereafter was re-argued and re-submitted to the court sitting en banc.

All points on appeal herein, based upon motions, objections and proffers of instructions to the jury made primarily on behalf of defendant-Schutz, were made to apply to all defendant-appellants by stipulation in the trial court.

Saul Samuel, Walter Samuel, Sam Brown, Murray Schutz and E. D. Hoffman were indicted in March, 1946, for conspiracy, 18 U.S.C.A. § 88,[1] by a United States Grand Jury sitting in San Francisco, California. After several motions had been made and

1 "Conspiring to commit offense against United States. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both." 18 U.S.C.A. § 88.

denied, all pleaded not guilty, and they went to trial before a judge and jury. At the close of the government's case, motions for acquittal were granted as to Hoffman and denied as to the others. Similar motions were denied the others at the conclusion of evidence taking. All four were convicted and sentenced, and they appeal.

The indictment charges an unlawful agreement to violate the provisions of the law that have to do with two tax statutes (27 U.S.C.A. § 203, to engage in the business of purchasing distilled spirits for resale at wholesale without having secured a basic permit from the Secretary of Treasury; and 26 U.S.C.A.Int.Rev.Code, § 3253, to carry on the business of a wholesale liquor business without having paid a specially required tax) and to violate the Emergency Price Control Act, 50 U.S.C.A.Appendix, §§ 902, 904(a) and 925(b), Office of Price Administration Regulations, Maximum Price Regulations 193 and 445, by selling distilled spirits at prices in excess of the fixed maximum prices.

In the month of August, 1943, there was a distinct shortage of whiskey in the San Francisco market. A Mr. Charles W. Saunders appears to have "had dealings", as he puts it, with a Mr. Marcus concerning a carload shipment (1850 cases) of what was termed "Old Marshall Straight Rye Whiskey." At about the same time, Saunders saw Mr. Muray Schutz, and shortly thereafter the whiskey was warehoused to the latter. According to Saunders, he had nothing further to do with Mr. Schutz or with the shipment of whiskey, except that the two did meet after the indictment in this case was filed, and Schutz requested Saunders to to give him an affidavit to the effect that Saunders had directed Schutz as a licensed manufacturer's agent to ship the "Old Marshall" to various retailers, and Saunders refused to comply with the request. A witness testified that Saunders appeared at the Samuel's Liquor Store, when matters pertaining to the whiskey were under discussion and was paid "finder's" fees. Schutz, on the witness stand, confirmed his receipt of the shipment of whiskey and testified that Saunders came to his place of business with a proposal to take the whiskey off his hands, and

later Saunders reported "* * * he had approached some retailers and they would take the entire car." According to Schutz, there was no discussion as to price between them.

On the 18th or 19th of August, Schutz says, Saunders reported that the purchasers had arranged a loan from Morris Plan Bank, and upon his presenting a warehouse receipt, the purchase money would be paid. Schutz had fixed his price at $23.85 per case, an O.P.A. price as he figured it, plus $1.92 for State Tax, or a total to him of $25.77. Later, upon Schutz presenting his warehouse receipt, Morris Plan Bank would lend only $27,000, whereas the full car lot of whiskey would amount to more than that. A proportional amount of the whiskey was released. Later more was released upon a further payment, and, in all, money received from the bank covered the Schutz' price for 1275 cases. Out of the 1850 cases, 575 were left on Schutz' hands. The evidence is to the effect that Schutz originally had 1970 cases of Old Marshall Straight Rye Whiskey, 150 cases more than the shipment mentioned by Saunders. The nominal, if not the actual, borrower of money to put into a deal concerning the whiskey was Walter Samuel, who owned "Samuel's Liquor Store" of San Francisco. Sam Brown, father-in-law of Walter Samuel was actively engaged in the conduct of the store, while Walter was working long hours in shipyards. Walter Samuel claims to have had little information of the whiskey deal. Saul Samuel testified that he had nothing to do with the deal as a principal but that he was an independent liquor salesman and knew that Brown was involved in the deal; that he put no money into purchase of the Old Marshall Whiskey, though he let his son have some money as a loan, as he occasionally did. He had nothing to do with the borrowing of the money, but as a wholesale salesman (not dealer) on his own account, he made inquiries and took orders from part of the group of retailers who later had business with Sam Brown and Samuel's Liquor Store regarding the whiskey. Brown testified that Saul Samuel represented Samuel's Liquor Store, which in turn were "selling agents for Distillers Distributors [Schutz]".

Brown claims that the whole deal was that the Samuel's retail liquor store needed whiskey, and upon hearing of the Old Marshall shipment to Schutz, that he arranged to raise money through the Bank to pay for the shipment. Samuel's Liquor Store bought outright for their store trade some 300 cases of the whiskey, and Brown acted as agent for Schutz in the sale of the rest of the whiskey obtained from Schutz. Neither of the Samuels nor Brown had a wholesaler's basic permit, nor had they paid the required special liquor tax. Saul Samuel and Schutz both testified that Saul offered to sell the whiskey left on Schutz' hands and that Schutz agreed. Schutz says he thought Saul "a free lance salesman." Saul Samuel sold some of the 1850 cases of whiskey, which had not been paid for by Samuel's Liquor Store. These sales were for the additional figure of around $50.00 per case. Saul Samuel's testimony is that the money received by him for such sales was turned over to Mr. Brown, and that the invoice price was to be paid to Schutz. There is in evidence nine of Schutz' bank deposit slips, each exactly divisible by $25.-77, dated at about the time these sales took place, which would seem to indicate the sale by Schutz of 550 cases of whiskey at that price per case and the overplus appears to have gone to others.

A large part of the whiskey covered by the Morris Plan money was eventually sold in various quantities prior to August 30, 1943, to tavern keepers and other retailers at enhanced prices, ranging mostly around $50 per case. Brown was active in bargaining with the retailers for the whiskey.

Much of the whiskey was billed directly to the retail purchasers from Schutz or in his trade name at $25.77 per case, and generally that sum was paid for by check. The balance was paid in cash. The government claims Schutz profited by receiving a division of the cash payments, but Schutz claims he never received any remuneration except his set case price as quoted to Samuel's Liquor Store. It is claimed by Brown that a large sum of money was paid Saunders and another by the name of Corrigan as "finders." A "finder" appears to be a person who can give information as to where the commodity can be purchased.

The details of his operations are not in the evidence.

Schutz stated on the stand that he had met Saul Samuel once sometime before they met at the Morris Plan Bank, but that he had not known Brown or Walter Samuel. Schutz testified: "So far as I knew the names that Mr. Saul Samuel brought me and which were not accompanied by money representing $25.77 a case were those that had gone in with him to buy the whiskey."

Schutz' bookkeeper testified to the effect that Schutz admitted that he knew neither the Samuels nor Brown had a wholesaler's license, but this Schutz denies. He testified, however, to the direct question as to his knowledge on the subject: "I didn't believe they were [wholesalers]," and later he said that he knew Walter Samuel had no license.

On February 4, 1946, taxes were paid the government for and by Walter Samuel, a wholesale liquor dealer, from July, 1943, to June 30, 1944, and all the special taxes of Walter Samuel were paid on that date.

There is more evidence, but what we have related fairly outlines the general situation. The government claims that appellants schemed together to profit by selling the whiskey above the O. P. A. ceiling price. Schutz claims there was nothing to the transaction but a straight sale from him to Samuel. Saul Samuel claims he acted only as a free lance liquor salesman for the whiskey owners. Walter Samuel claims he was ignorant of what was going on. Brown claims the sales to tavern owners were made by him and Samuel's Liquor Store as selling agents for Schutz.

It is not to be denied that each of these theories was arguable to the jury. The government claims that the transaction was no more nor less than a scheme to defeat all ceiling price regulations. The evidence is clear that the retailer, after paying the Schutz' invoice price by check, paid almost as much more in money. Who got the extra money, is in dispute.

There are points on appeal upon claims that evidence was improperly admitted, and that evidence admitted could not apply to one or the other of the defendants. There are instances in which argument on such

points could fairly be made, but we have noticed no instance wherein the wrongful admission of evidence would rightly be held as prejudicial error. In the view of the law as the court entertained it, the court was not in error in deeming the evidence, as it stood at the conclusion of the case, sufficient to be submitted to the jury. In view of the law as we find it to have been, we think the issue concerning the sales at over-ceiling prices should have been taken from the jury at the outset of the trial.

■ The point is made that the general conspiracy statute does not apply to conspiracy to violate a regulation issued by O.P.A. We need not dwell on the point, since it was heretofore raised in and adversely ruled upon by this court in the case of Blumenthal v. United States, 9 Cir., 158 F.2d 883. Since the submission of the instant case to us, the Blumenthal case has been affirmed by the United States Supreme Court, 332 U.S. 539, 68 S.Ct. 248. See specifically note 18 of that opinion, 332 U.S. at page 560, 68 S.Ct. 248. The court did not commit error by denying the motion to strike.

Before going to trial on the merits, Schutz filed a motion requesting that the government be ordered to furnish him a bill of particulars informing him as to "the price established by law or regulation for the kind of whiskey the indictment alleged defendants conspired to sell at prices ,in excess of that established by law" and as to whether the conspiracy to sell the whiskey was one to sell at wholesale or retail. In the overt act portion of the indictment there is reference to the kind of whiskey. Wherein this reference was lacking, we are not informed. It is plainly stated in the body of the indictment that the conspiracy was to purchase and resell at wholesale.

■ The next two demands for particulars were that Schutz be furnished the maximum wholesale and retail price in 1943 and the price established for the sale of the whiskey at wholesale and retail on August 20, 1943. As we shall presently show, the ceiling price for whiskey could be fixed in four different ways dependent upon circumstances. It would seem entirely reasonable that the accused should have been informed of the method the government claimed was the proper one in the premises and it is practically certain that the trial judge presiding would have taken this view and granted the request for the bill of particulars had court and counsel not been misled by an error as to the applicable regulation of the O.P.A. hereinafter explained. Had the regulation erroneously thought by the court to be in effect actually been in effect, the bill of particulars as to the ceiling price would have been but the repetition of a simple regulation and would not have aided the accused. In the light of the regulations actually in effect, a bill of particulars would have informed the accused of matters vital to the charge laid against them. There is small wonder that errors of this kind did occur. Regulations were coming out of the O.P.A. thick and fast, and courts and lawyers were put to it to figure what was the law at any given time. Refusal to order the bill was error. In our disposition of the case, we need not say whether the error called for reversal.

■ Appellants complain that the court did not give an instruction which they proffered on the subject of circumstantial evidence, and that the court's instruction on the subject is erroneous. The main point made is that an instruction which provides that guilt can be premised upon the jury's view that no other reasonable conclusion but that of guilt can be drawn from the evidence is error. It is argued that the court must add to the instruction the statement that the evidence must not only be consistent with guilt but inconsistent with every other hypothesis. We have recently had occasion to treat this subject fully in McCoy v. United States, 169 F.2d 776, in which we differ from appellants' views in the instant case. We are of the opinion that the court committed no error here.

■ A point is made by Schutz that conversation made outside his presence as to whiskey sales cannot be evidence against him for the reason that the corpus delicti had not and never has been laid—that the corpus delicti as to him cannot be found by the conversation of alleged co-conspirators. We agree with this general statement of the law, but, in the view of the O.P.A. reg-

ulation as it was understood by the court we think the statement of fact as we have briefly set it out establishes the corpus delicti.

■ A form of instruction was proffered on behalf of Schutz, in reference to his honest belief as to the distribution of the whiskey, but the court did not give it. We think it was not error to fail to give the proffered instruction. The court fairly and comprehensively defined the issues. The ultimate issue was, of course, the charge of conspiracy. The court's instructions made clear to the jury that appellants, to conspire, must have agreed to cooperate in order to accomplish an illegal purpose, or to violate a law to accomplish a legal purpose, and that before either of the accused could be convicted, it must be proved that he intended to violate the law.

■ We now come to the error which, in our opinion, necessitates reversal of the judgment. The court correctly instructed the jury as to the law covering the basic wholesaler's license, and the tax laws involved but its instruction to the effect that there was a maximum price for the wholesale of the whiskey was not accurate. It was the law that before the whiskey could be sold legally, a maximum price must be fixed. It will be seen that so far as shown none was fixed for the whiskey in suit. The court then gave an erroneous formula for ascertaining the maximum wholesale price for whiskey. Briefly the formula, as given to the jury, was that the wholesaler could "mark up" his sales price 15% over his costs, including taxes, handling and perhaps some other incidental charges. The formula as given was issued as an O.P.A. regulation, but it did not become effective until August 30, 1943, which was subsequent to the period when allegedly the conspiracy was formed and in operation. (M.P.B. 445, § 5.10, 9 F.R. 4687.) Appellants argue this mistaken instruction as reversible error.

■ In a criminal case the court must instruct on all essential questions of law involved, whether or not it is requested to do so. Kreiner v. United States, 2 Cir., 11 F.2d 722; Kinard v. United States, 68 App.D.C. 250, 96 F.2d 522; Morris v. United States, 9 Cir., 156 F.2d 525; United States v. Levy, 3 Cir., 153 F.2d 995; Corson v. United States, 9 Cir., 147 F.2d 437; Miller v. United States, 10 Cir., 120 F.2d 968; Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330; United States v. Noble, 3 Cir., 155 F.2d 315; United States v. Pincourt, 3 Cir., 159 F.2d 917; see 169 A.L.R. 305-355 on the subject generally. We think giving the wrong law in this case was certainly not less prejudicial than omission to give the law at all.

The applicable O.P.A. law is set out in the margin,[2] and it shows that the formula

---

[2] Since M.P.R. No. 445 was not in effect at the time the transactions in the instant case took place, it is only important to mention that by its terms, and until it became applicable, General Maximum Price Regulation and M.P.R. No. 193 were to remain in effect.

General Maximum Price Regulation and M.P.R. No. 193 were in effect at the time the transactions in question occurred. They were devised and promulgated in the order in which we have set them forth, but M.P.R. No. 193 specifically retained provisions of General Maximum Price Regulation.

Applicable portions of M.P.R. No. 193 are as follows:

M.P.R. 193, § 1420.7: "Applicability of the General Maximum Price Regulation. Except as provided in §§ 1420.8 and 1420.13, the provisions of this Maximum Price Regulation No. 193 supersede the provisions of the General Maximum Price Regulation with respect to sales or deliveries of domestic distilled spirits for which maximum prices are established by this Regulation."

M.P.R. 193, § 1420.13: " * * * Maximum prices for domestic distilled spirits —(a) Determination of maximum prices generally. The seller's maximum price for domestic distilled spirits shall be the seller's maximum price established under § 1499.2(a) of the General Maximum Price Regulation, plus the following additions:

"(1) Manufacturers may add: * * *

"(2) Sellers, other than manufacturers may add:

"(i) The difference between the maximum price established for the seller's supplier under the General Maximum Price Regulation with respect to the domestic distilled spirits to be priced and the maximum price established for the seller's supplier under this Maximum

for ascertaining the maximum wholesale whiskey price as given by the court had no relation to it.

Stated briefly and not completely in detail the applicable law provided that the General Maximum Price Regulation was in effect; that the maximum price shall be the seller's maximum price at the highest price charged by him for the same or similar merchandise during March, 1942, plus the amount the supplier had to pay over that paid during March, 1942, and plus the amount of any new tax. The maximum price in our case could not be figured by the use of the above formula for the reason that none of the appellants were doing a wholesale business for whiskey during March, 1942, or prior thereto, and for the further reason that the evidence does not treat of any additional amount paid by supplier over that paid in March, 1942, or upon any new tax.

If the above formula cannot be used, then the maximum price may be figured by reference to the prices of the "most closely competitive seller" for a similar commodity. There is no evidence in the case covering such contingency. None of the appellants could have had a competitive seller in 1942, since none was shown to have been selling in that year, nor is there proof of the price of sales in 1942.

If neither of the formulas can be used, and we have seen that neither can be used, then the maximum price must be determined under Regulation 1499.3(c) "after specific authorization from the Office of Price Administration or any duly authorized officer thereof." There is no evidence as to any such action. With the burden of proof on the appellee, there is no presumption that such a price was determined and that the sale was at a higher price. Moreover, the charge of the indictment is selling "at prices in excess of and higher than the maximum prices established by law and regulations." It does not charge a sale where no price has been established under Regulation 1499.3(c).

It is seen that the formula given by the court had no relation to the law as it existed during the period of the alleged conspiracy, and that it is not possible for us to make any comparison as to the effect on

---

Price Regulation No. 193 with respect to such domestic distilled spirits.

"(ii) The amount of any new tax * * *

"(b) Determination of Maximum prices by reference to maximum prices of most closely competitive seller. If the seller's maximum price for the domestic distilled spirits to be priced cannot be determined under paragraph (a) of this section, the seller's maximum price for such domestic distilled spirits shall be the maximum price established under paragraph (a) of this section for the most closely competitive seller of the same class for such domestic distilled spirits or for the similar commodity most nearly like it (as such term is defined in § 1499.2 of the General Maximum Price Regulation) for sales to a purchaser of the same class. * * * *"

M.P.R. 193, § 1420.13(c): "Determination of Maximum Prices under § 1499.3 of the General Maximum Price Regulation. If the seller's maximum price for the domestic distilled spirits to be priced cannot be determined under paragraph (a) or paragraph (b) of this section, the seller's maximum price for such domestic distilled spirits shall be determined in accordance with § 1499.3 of the General Price Regulation."

The provisions of General Maximum Price Regulation are succinctly set forth in this court's opinion in Martini v. Porter, 9 Cir., 157 F.2d 35, at page 37, as follows: "There are four sections under the G.M.P.R. providing methods for ascertaining maximum prices. The first, Section 1499.2(a), fixes prices at the highest price charged by the seller during March, 1942, for the same or similar commodities. The second, Section 1499.2(b), provides that if the seller made no such sales during March, 1942, then his maximum prices are those charged during March, 1942, by his most closely competitive seller for the same or similar commodities. The third, Section 1499.3(a), if the prior methods are unavailable, gives the seller a formula based on his maximum prices for his most comparable commodities delivered during March, 1942, provided he sold the comparable commodities at the same distributive level in March, 1942." And the fourth, Section 1499.3(c), "* * * provides in general that 'the maximum price shall be a price determined by the seller after specific authorization from the Office of Price Administration or any duly authorized officer thereof.'"

the maximum price between the true applicable law and the erroneous law actually applied by the jury. We are not at liberty to assume that the instruction as given was favorable to appellants and, therefore, non-prejudicial.

Appellants offered an instruction which correctly stated the law as we have explained it, except that it did not cover the contingency that in case the formulas given did not apply, application must be had to the Office of Price Administration for special authorization to sell. However, the government did not contend that a maximum price was ever fixed by special authorization. Had the court given the correct instruction instead of the erroneous one it gave, the jury would have had before it a very different question. Had the court realized that the law was as outlined above, the issue of selling above ceiling would, no doubt, have been taken from the jury as appellants requested it to be.

It may be well at this juncture to say that there is no direct evidence that Schutz' price of $25.77 was the ceiling price; Schutz merely testified that he assumed that it was an O.P.A. price as he figured it. But even if we may infer from the circumstances that all concerned thought it was the maximum O.P.A. price, the problem presented by the misdirection would not disappear.

We have seen that no O.P.A. price within or at the ceiling could have been figured from the evidence in the case. Yet it is highly probable that the jury took the price named by Schutz as the maximum wholesale price and, because the sales price to tavern keepers was more than a "markup of 15%," found appellants guilty of violating the maximum O.P.A. price. It is probable, too, that this element of the case had great weight with the jury as to whether there had been a conspiracy at all.

The government argues that the law was correctly given, and cites our decision in Martini v. Porter, 9 Cir., 157 F.2d 35. The Martini case does clearly analyze the O.P.A. law, but there is no question in that case that touches the misdirection in our case. The government also contends that since the court correctly instructed the jury that *there was a ceiling price* and that the case was tried upon that basis, the part of the instruction referring to a markup of 15% is surplusage. We have seen that the premise for this argument is not strictly as the government puts it; but, even so, this contention cannot be sustained.

The theory of the case from the government's standpoint is that the conspiracy was entered into sometime in the early part of August, 1943, and we note that every alleged overt act in furtherance of the conspiracy was performed within such month. It must be kept in mind that the charge in the instant case is not upon the substantive offenses mentioned in the indictment, but upon a conspiracy to violate them. To prove the conspiracy, it was not necessary to prove the commission of any substantive offense. On the other hand, proof of any substantive offense would not necessarily prove the conspiracy. It was necessary to prove the alleged agreement and some act in furtherance of the agreement. And since there is no direct evidence of the alleged conspiracy, any conclusion that one existed must be deducted from the conduct of the alleged conspirators themselves and other competent secondary evidence. The court instructed the jury that a verdict of guilty could be found upon proof that the conspiracy included an agreement to violate but one or to violate more than one of the substantive offenses set out in the indictment, pointing out most specifically that if the jury should conclude that a conspiracy existed to violate an O.P.A. price regulation a verdict of guilty could rest upon that conclusion alone. Having done this the court applied the same principle to the two other laws contained in the indictment as the subject of the alleged conspiracy. The court correctly stated the general law in this instruction, but, as we shall presently see, the misdirection, which we have mentioned, made its application in this case erroneous. The law was correctly given the jury in relation to the substantive offenses relating to the basic permit and to the tax. The law was incorrectly given that a maximum price had been fixed and, also, the method by which the maximum price must be fixed was incorrectly given. We are faced with

the problem as to whether this error vitiated the verdict of the jury, which was general in nature, as it may have related to a conspiracy to violate either one or all three of the substantive offenses.

The conspiracy, if one existed, was for the purpose of gaining an illegal profit by device to sell in violation of the ceiling price. The deception method chosen by the conspirators, if appellants were such, presented the incidental necessity of violating the wholesale basic permit and the tax laws as alleged.

From the verdict we do not know upon which one, if only one, or upon which two, or whether upon all three of the laws alleged in the indictment was or were found by the jury to be within the purview of the conspiracy they found to exist. It is certain, from what we have said, that if the violation of the maximum regulation was the only law guilt was built upon, the conviction should not stand. The evidence as to none of the three was necessarily conclusive. Each appellant introduced evidence in support of a theory peculiar to his own case, which he claimed established his innocence so far as a conspiracy is concerned. The jury's duty was to weigh all such evidence, giving such credence to it, and to witnesses, as it thought right under the law. If the case had been presented without any evidence and any instruction relating to the purpose of illegal gain through deceptive violation of the maximum whiskey price, there would have been little to support a conspiracy at all. If appellants conspired to sell whiskey at wholesale through an agency not entitled in law to do so or through any other illegal means, they must have done so under a powerful motive. The fiber that holds a conspiracy together is the illegal gain—money or other desired thing.

It is most probable that the only reason the jury found guilt at all—the only reason the jury found themselves in agreement with the government that these four appellants got together and by agreement acted to violate any one of the three laws mentioned in the indictment, was that the sale of the whiskey was for sums greater than the law allowed. That was the con-clusion the prosecution drove hard to prove; that was the conclusion appellants by their conflicting defenses sought to combat. The judge regarded that issue as one, if not the most important, issue of fact in the case and received evidence upon the subject and instructed the jury as to the law (incorrectly) upon it. Through this element of the case alone can the conduct of all appellants be harmonized.

Without the presence of the illegal profit issue, no one can tell whether the jury would have found, as Schutz contended was the fact, that he simply and only sold the whiskey for distribution to Saunders' customers at the price of $25.77 per case, and that Samuel's Liquor Store was the medium through which Saunders acted for delivery (there is no direct evidence of any money received by Schutz over his sale price; an illegal profit, however, might have convinced the jury that Schutz' actions were in furtherance thereof); whether Walter Samuel actually was ignorant of the deal and regarded his signing of the notes to the bank as an innocent act under the store's manager, Mr. Brown (without his expectation of an illegal profit, there would be little, if anything, upon which to base a conspiracy with any one of the appellants to violate any law); whether Brown was telling the truth that he and Samuel's Liquor Store were merely selling agents for Schutz; whether Saul Samuel merely loaned his son some money and had no interest in the deal, and acted in the sale to taverns merely as a free lance liquor salesman for Schutz and for Samuel's Liquor Store. Yet the jury was never given the law from which they could determine whether or not any sales price would or did afford an illegal profit. Worse, they were misdirected as to the law in such a manner as to compel the conclusion that there had been an illegal profit. Had the court not mistaken the law, this false issue would never have been given the jury.

Conspiracies are seldom written out, and conversations regarding them are rarely overheard. Acts of persons considered in the light of advantage to them and in the light of the law must needs be the basis

of most prosecutions for conspiracy; that is, juries are asked to consider the acts of persons in the lights we have mentioned and determine whether they show beyond reasonable doubt that an agreement between two or more of the accused persons actually existed. We do not intimate that all of the acts of appellants were innocent ones; what we wish to make plain is that with the illegal profit item eliminated, there is scant reason to conclude that the acts done by any of appellants were in furtherance of a prearranged or concerted plan to do them. The jury was told, as all juries are correctly told, that they must consider the issues of the case upon the law as it was given them by the court. The error supplied a powerful reason for determining that a conspiracy existed to violate each one of the laws in the process toward the illegal gain. The erroneous instruction carried as great a prejudice against the appellants as the wrongful admission of very highly prejudicial evidence could have carried. Since it destroyed the possibility of a fair trial under the due process of law, we cannot gloss it over through the process of rationalizing the evidence into support of the verdict.

The case of Kepl v. United States, 9 Cir., 299 F. 590, is to the effect that in conspiracy cases the government is not required to prove all that it charges, and in McDonnell v. United States, 1 Cir., 19 F.2d 801, it is held that it is enough if any overt act in furtherance of the purpose of the conspiracy is proven. See McWhorter v. United States, 5 Cir., 62 F.2d 829. These cases and others are cited as authority for the validity of the verdict notwithstanding the erroneous instruction. The Kepl case and those like it concern only the proof as to overt acts. It matters not that some overt acts alleged in the indictment were not sufficiently proved. The reason for this is that since verdicts of juries must be viewed as the work of ordinary intelligent and reasoning beings, judges will not presume that a jury would find guilt upon an item not proved but that they would find guilt upon an item well proved. The difference between the instant and the cited cases is as plain as daylight. In our case intelligent and reasonable consideration by the jury of the whole case, as given it, would almost surely have lead to a wrong application of important testimony. In the cited case intelligent and reasonable consideration of the whole case would only result in a just verdict upon conclusions supported by evidence. In our case we are not concerned with the mere matter of insufficient proof as to some alleged overt acts. We are concerned with the stern fact that appellants may have been convicted of a conspiracy to violate a non-existent law or that they may have been convicted of a conspiracy to violate existing law because of the logical application of the non-existing law to the evidence introduced.

We are aware of the doctrine pronounced in the case of Selvester v. United States, 170 U.S. 262, at page 268, 18 S.Ct. 580, 42 L.Ed. 1029, at page 582, which followed and cited the case of Claassen v. United States, 142 U.S. 140, 146, 12 S.Ct. 169, 35 L.Ed. 966, that where there are several separate counts in the indictment, some good and some bad, and the jury found guilt as to the offenses charged in each count by a general verdict, and the sentence pronounced was in accord with that provided for a single offense under the statute on which the indictment was based, the presumption of law is that the court awarded sentence on the good count only, and the judgment will be sustained. However, the court in the cited case stated a limitation of the doctrine, which is particularly pertinent to our case. The court said [170 U.S. 262, 268, 18 S.Ct. 582]: "The necessary effect of the decision in that case [Claassen v. United States, supra] was to establish that, although distinct offenses were charged in separate counts in one indictment, they nevertheless retained their separate character to such an extent that error or failure as to one had no essential influence upon the other." The Supreme Court emphasized the same limitation in United States v. Trenton Potteries, 273 U.S. 392, at page 402, 47 S.Ct. 377, 381, 71 L.Ed. 700, 50 A.L.R. 989, by saying: "There is nothing in the record to suggest that the verdict of guilty on the first count was in any way induced by the introduction of evidence upon the second. In these circumstances the judgment must be sus-

tained if either one of the two counts is sufficient to support it [cases cited]." Of course, the limitation stressed by these cases wherein distinct and separate counts as to crime are alleged in the indictments would be applied even more appropriately where the offense alleged is single and each allegation of an illegal act constitutes a connecting step toward the accomplishment of the intended illegal purpose. The case of Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484, raises much the same point on principle that we have under consideration, and therein, 283 U.S. at page 367, 51 S.Ct. 535, the court said: "The verdict against the appellant was a general one. It did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury were instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause. It may be added that this is far from being a merely academic proposition, as it appears, upon an examination of the original record filed with this Court, that the State's attorney upon the trial emphatically urged upon the jury that they could convict the appellant under the first clause alone, without regard to the other clauses. [In our case the emphasis upon the same idea was a mandatory instruction to the jury by the judge presiding.] It follows that instead of its being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld." The case of Williams v. North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273, presents a situation close on principle to our case. At pages 291, 292, of 317 U.S. 63 S.Ct. 210, the court says: " * * * the verdict

against petitioners was a general one. Hence, even though the doctrine of Bell v. Bell * * * [181 U.S. 175, 21 S.Ct. 551, 45 L.Ed. 804] were to be deemed applicable here, we cannot determine on this record that petitioners were not convicted on the other theory on which the case was tried and submitted, viz. the invalidity of the Nevada decrees because of Nevada's lack of juridiction over the defendants in the divorce suits. That is to say, the verdict of the jury for all we know may have been rendered on that ground alone, since it did not specify the basis on which it rested. It therefore follows that here as in Stromberg v. California, 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117, 73 A.L.R. 1484, that if one of the grounds for conviction is invalid under the Federal Constitution, the judgment cannot be sustained. [Invalidity for any other reason would be as effective.] No reason has been suggested why the rule of the Stromberg case is inapplicable here. Nor has any reason been advanced why the rule of the Stromberg case is not both appropriate and necessary for the protection of rights of the accused. To say that a general verdict of guilty should be upheld though we cannot know that it did not rest on the invalid constitutional ground on which the case was submitted to the jury, would be to countenance a procedure which would cause a serious impairment of constitutional rights." The Supreme Court said by way of note to Haupt v. United States, 330 U.S. 631, at page 631, 67 S.Ct. 874 at page 878, 91 L.Ed. 1145: "When speaking of a general verdict of guilty in Cramer v. United States, 325 U.S. 1, 36, 65 S.Ct. 918, 935, 89 L.Ed. 1441, n. 45, we said 'Since it is not possible to identify the grounds on which Cramer was convicted, the verdict must be set aside if any of the separable acts submitted was insufficient' of course we did not hold that one overt act properly proved and submitted would not sustain a conviction if the proof of other overt acts was insufficient. One such act may prove treason, and on review the conviction would be sustained, provided the record makes clear that the jury convicted on that overt act. *But where several acts are pleaded in a single count and submitted to the jury,*

*under instructions which allow a verdict of guilty on any one or more of such acts, a reviewing court has no way of knowing that any wrongly submitted act was not the one convicted upon.* If acts were pleaded in separate counts, or a special verdict were required as to each overt act of a single count, the conviction would be sustained on a single well-proved act. As the acts were here pleaded in a single count, and the jury were instructed that they could convict on any one, we would have to reverse if any act were insufficient or insufficiently proved. Cf. Stromberg v. California, 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117, 73 A.L.R. 1484; Williams v. North Carolina, 317 U.S. 287, 292, 63 S.Ct. 207, 210, 87 L.Ed. 279, 143 A.L.R. 1273; and Cramer v. United States, supra." (Emphasis added.)

Summarizing our conclusion is: The judgment must be and is reversed because it rests upon a general verdict which may have been found upon the jury's conclusion that a conspiracy existed to violate any one, any two, or all of three United States laws, set up in one count, one of which was erroneously defined to the jury, and such erroneously defined law was so closely connected with both of the other laws in the alleged conspiracy as to affect the decision upon them to the reversible prejudice of all defendant-appellants.

There is some suggestion that one sale of whiskey was made after the formula as to maximum price as given in the court's instruction was effective. The evidence, however, does not establish such to be the case. This referred to a sale to Emilio Picchi, which was evidenced by an invoice dated August 27, 1943.

One of the overt acts charged is that a sale to Francis E. Duffy occurred on or about August 31, 1943. This sale, however, is not within the M.P.R. section given the jury for the reason that that transaction occurred on August 28, 1943, as is disclosed by the date of the invoice.

If the evidence does show one act after the maximum price formula, as given, became effective, it would, of course, show a violation of a substantive offense, but the instruction applied to all of the sales showing a very large money gain supporting the reasonableness of the charge of conspiracy. The fact that one sale was in accord with the instruction does not wipe out the harm done.

The verdict and the judgment as to each and every appellant is reversed.