**AMERICAN BREWERY, Incorporated, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 6334.

United States District Court, D. Maryland.

Oct. 2, 1954.

Anderson, Barnes & Coe, Baltimore, Md. (Wilson K. Barnes) Baltimore, Md., for plaintiff.

Kurl Melchior, Atty., Dept. of Justice, Washington, D. C., and Paul C. Wolman, Jr., Asst. U. S. Atty., Baltimore, Md.

COLEMAN, Chief Judge.

This is a suit to recover Federal income taxes, declared value excess profits taxes and excess profits taxes in the amount of $24,025.83, alleged to have been illegally assessed against the plain-

tiff, American Brewery, Incorporated, resulting from the refusal of the Collector of Internal Revenue for the District of Maryland to allow a deduction of $32,-117.14, as a business expense, from the gross income of the Brewery in its return for its fiscal year, April 1, 1945 to March 31, 1946. A claim for refund of this amount was duly made to the Collector on November 29, 1948, but the Collector disallowed the claim on the ground that the $32,117.14 which had been deducted from gross income was not an ordinary and necessary business expense, but represented a penalty. Thereupon, the Brewery filed suit in this Court to recover the amount of its claim, asserting that the deduction of $32,117.14 was properly made from the gross income of the Brewery as an ordinary and necessary business expense in accordance with Section 23(a) (1) (A) of the Internal Revenue Code, 26 U.S.C.A. § 23(a) (1) (A).

Most of the facts are not in dispute and these may be summarized as follows: American Brewery, Inc., the plaintiff, hereinafter referred to as the Brewery, is a Maryland corporation operating a brewery in the City of Baltimore, which it has done since 1939, and for several years prior to 1946, in addition to producing beer, it prepared barley malt syrup for sale. In the year 1939 it sold this syrup at the then prevailing price for barley malt of 92¢ a bushel, plus 6¢ a pound, with the proviso that this cost per pound, based upon the number of pounds in a barrel of barley malt syrup, plus or minus the actual market price of the barley malt used in making the syrup over or below 92¢ a bushel, would be the selling price per barrel of the barley malt syrup.

In July and August, 1943, it became apparent to the Brewery that the price as aforesaid was no longer profitable. Thereupon, the Brewery applied to the Office of Price Administration, hereinafter referred to as the O.P.A., for permission to increase its price of 6¢ to 7¢ a pound, plus or minus the cost of barley malt in relation to the base price of 92¢ a bushel. At this time the Brewery advised the O.P.A. of the computation of its current prices as charged by it. Upon these facts, voluntarily disclosed by the Brewery, the O.P.A. ruled that according to the General Maximum Price Regulation, the Brewery was making an overcharge because nothing could be added to the 6¢ ceiling price. Upon the Brewery's refusal to admit the overcharge, the O.P.A. filed suit in this Court under Section 205(e) of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 925(e), alleging that the Brewery had, between January 19th and December 31st, 1943, overcharged for the barley malt syrup in the aggregate amount of $32,117.14, and sought judgment for three times that amount or $96,351.42. The Brewery filed a motion to dismiss the O.P.A. complaint on the ground, among others, that the barley malt syrup was not subject to any O.P.A. regulation during the period covered by the complaint, and this Court sustained the Brewery's contention and dismissed the complaint. Bowles v. American Brewery, D.C., 56 F.Supp. 82. On appeal, this Court was reversed, 4 Cir., 146 F.2d 842, and the case was remanded to this Court for further proceedings, the Court of Appeals for this Circuit holding that the General Maximum Price Regulation had not been repealed or suspended by the Inflation Control Act of October, 1942, 50 U.S.C.A.Appendix, §§ 901, 961 et seq., or by Executive Order 9250 promulgated thereunder, 50 U.S.C.A.Appendix, § 901 note, U.S.Code Cong.Service 1942, p. 1263, and therefore controlled.

Following the mandate of the appellate court, the O.P.A. filed an amended complaint in this Court, changing the allegations with respect to the essential nature of the barley malt syrup from an enzymatically treated (fermented) syrup to a simple syrup. Thereupon, the Brewery moved to dismiss this amended complaint, but this Court denied the motion. Before the hearing was had upon the motion, the O.P.A. and the Brewery reached a settlement of the litigation whereby the

Government agreed to accept in full payment the sum of $32,117.14, namely, the amount of the alleged overcharge without payment of treble damages, and on November 9, 1945, the suit was entered agreed, settled and satisfied by the O.P.A. What thereafter led up to the present suit, which was filed on January 16, 1953, has already been stated.

The position of the Government is that the Brewery is not entitled to any refund on the ground that the overcharge, if not wilful, was at least the result of failure to take practical precautions with respect to conforming to the maximum ceiling price, and that, therefore, the Brewery is not permitted to treat the deduction of $32,117.14 from its gross income as an ordinary and necessary business expense in accordance with the provisions of 26 U.S.C.A. § 23(a) (1) (A), but that such payment was in the nature of a penalty and therefore not deductible.

At the trial the Court heard testimony which was limited to that of the president of the Brewery and of the chief attorney for Maryland of the O.P.A. at the time when the present controversy first arose, and documentary evidence was also introduced through the Brewery's president, as a result of which the Court finds the following additional facts, disclosing some further details with respect to what preceded the original controversy: In May, 1942, when the General Maximum Price Regulation became effective, the president and other officials of the Brewery read the relevant portions of this Regulation and concluded that the established pricing method of the Brewery, as above set forth, could properly continue, they believing that the price of barley malt was not fixed or established by any price control legislation or regulations. In the Summer of the following year, 1943, however, the Brewery concluded that the price it was charging for barley malt syrup could not profitably be continued, overhead costs, including the price of barrels, having advanced. Thereupon, the Brewery, before increasing its basic price of 6¢ a pound for the syrup, inquired of the local O.P.A. with respect to the proper procedure incident to obtaining a price increase. On August 7, 1943, that office explained the procedure in writing, and on August 10, the Brewery wrote the O.P.A., Food Section, in Washington, D. C., requesting an increase of its basic price from 6¢ to 7¢ a pound, at the same time disclosing the total price that it had been charging. Under date of August 31, in a supplementary letter to the O.P.A., the Brewery further elaborated upon its pricing arrangement, disclosing that the price of barley malt had advanced from $1.12 per bushel in January, 1942, to $1.25 per bushel in January, 1943, and to $1.33 per bushel in August, 1943. The O.P.A., by letter dated September 8, 1943, referred the aforegoing request of the Brewery to the O.P.A.'s legal branch for appropriate attention. Following this correspondence, the O.P.A. instituted for the first time an investigation at the Brewery and received cooperation from its officers in connection with same. Nothing further was heard by the Brewery from the O.P.A. until the treble damage action was begun against it in January, 1944. In the course of the original proceeding before this Court, heretofore referred to, local counsel for the Price Administrator admitted in argument that "this case, on the merits, is a hardship case." He further stated that "The violations were, I will say, innocent and unintentional and excusable, but we do have them here and we contend and allege that the defendant, nevertheless, has sold a commodity subject to price regulation at a price in excess of the ceiling price." The result of the litigation, both before this Court and on appeal, has hereinbefore been explained, as well as the final settlement, and therefore need not be restated.

This Court further finds that the settlement made by the Brewery with the Government was done without the Brewery conceding that it had violated any law or regulation, in order (1) to avoid possible unfavorable publicity, even if the Brewery should ultimately be suc-

cessful in the litigation, in view of the complex nature of the case; and (2) to avoid additional expense and loss of time in litigating the matter before the Emergency Court of Appeals. It is further found that the Brewery had decided to, and did discontinue the production of barley malt syrup shortly following the settlement; that this had been only a small portion of its total business; that in 1943 the total net income of the Brewery, after taxes, was approximately $180,000, of which approximately only $1,600 represented net profit from the production of barley malt syrup; that the sales of barley malt syrup were made to other breweries for the production of beer, on which there was a ceiling price during 1943; and that the Brewery never had any complaint with respect to its price for barley malt syrup from any of its customers, or from any other source, prior to the filing of the original treble damage action in this Court by the O.P. A.

The pertinent language of Section 23 (a) (1) (A) of the Internal Revenue Code, 26 U.S.C.A. § 23(a) (1) (A), which gives rise to the present controversy is as follows: "Deductions from gross income. In computing net income there shall be allowed as deductions: (a) Expenses (1) Trade or business expenses. (A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," and then follows an enumeration of what such expenses include, i.e. salaries, traveling expenses, rentals, etc.

In the present case the Government does not contend that what the Brewery did was wilful which brought about the litigation which it lost, and as a result of which it paid the Government in settlement the sum now in dispute; but the Government claims that the Brewery's conduct was the result of failure to take practical precautions to conform to the maximum ceiling price.

The Supreme Court has in several decisions interpreted Section 23(a) (1) (A) of the Internal Revenue Code, but

upon facts quite different from those presented in the present case.

In Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249, the Court held nondeductible under this Section and an interpretative Treasury Regulation, the expenses of lobbying paid by an agent employed to secure certain legislation from Congress. However, there is nothing in the Court's opinion in this case which throws any real light upon the precise question before us.

In Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171, the Supreme Court allowed certain attorneys' fees and other legal expenses found to have been reasonable in amount and lawfully incurred by a licensed dentist (1) in resisting the issuance by the Postmaster General of a fraud order which would have destroyed the dentist's business, and (2) in connection with subsequent proceedings on judicial review of the same controversy. The tax-payer had lost before the Board of Tax Appeals, 47 B.T.A. 95; the court of Appeals, 7th Circuit, however, reversed the Board's decision, 133 F.2d 567, and the Supreme Court affirmed the appellate court and permitted the expenditures to be deducted as ordinary and necessary expenses of the taxpayer's business. But again, the facts in the Heininger case were so different from those now before us that this decision can scarcely be said to be very pertinent. Suffice it, therefore, to quote the following from the Court's opinion, 320 U.S. 467, 473–474, 64 S.Ct. 249, 253: "The Bureau of Internal Revenue, the Board of Tax Appeals, and the federal courts have from time to time, however, narrowed the generally accepted meaning of the language used in Section 23(a) in order that tax deduction consequences might not frustrate sharply defined national or state policies proscribing particular types of conduct. A review of the situations which have been held to belong in this category would serve no useful purpose for each case should depend upon its peculiar circumstances. A few examples

will suffice to illustrate the principle involved. Where a taxpayer has violated a federal or a state statute and incurred a fine or penalty he has not been permitted a tax deduction for its payment. Similarly, one who has incurred expenses for certain types of lobbying and political pressure activities with a view to influencing federal legislation has been denied a deduction. And a taxpayer who has made payments to an influential party precinct captain in order to obtain a state printing contract has not been allowed to deduct their amount from gross income. It has never been thought, however, that the mere fact that an expenditure bears a remote relation to an illegal act makes it nondeductible. The language of Section 23(a) contains no express reference to the lawful or unlawful character of the business expenses which are declared to be deductible. And the brief of the government in the instant case expressly disclaims any contention that the purpose of tax laws is to penalize illegal business by taxing gross instead of net income. Cf. United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037."

In Lilly v. Commissioner, 343 U.S. 90, 72 S.Ct. 497, 500, 96 L.Ed. 769, petitioners were engaged in the optical business in North Carolina and Virginia in 1943 and 1944. Pursuant to agreements reflecting an established and widespread practice in that industry in those localities, they paid to the respective doctors, who prescribed the eyeglasses which they sold, one-third of the retail sales price received for the glasses. The Supreme Court reversed both the Tax Court, 14 T.C. 1066, and the Court of Appeals, 188 F.2d 269, for this, the Fourth Circuit, and held that such payments were deductible by petitioners as " 'ordinary and necessary' " business expenses under Section 23(a) (1) (A) of the Internal Revenue Code, distinguishing Textile Mills Securities Corp. v. Commissioner, supra, and following Commissioner of Internal Revenue v. Heininger, supra.

In the Lilly case the Court said, 343 U.S. 90, at pages 96–97, 72 S.Ct. 497, at page 501: "Assuming for the sake of argument that, under some circumstances, business expenditures which are ordinary and necessary in the generally accepted meanings of those words may not be deductible as 'ordinary and necessary' expenses under § 23(a) (1) (A) when they 'frustrate sharply defined national or state policies proscribing particular types of conduct', supra, nevertheless the expenditures now before us do not fall in that class. The policies frustrated must be national or state policies evidenced by some governmental declaration of them. In 1943 and 1944 there were no such declared public policies proscribing the payments which were made by petitioners to the doctors."

Turning to lower court decisions, counsel for the Brewery stress primarily Jerry Rossman Corporation v. Commissioner, 175 F.2d 711, a decision of the Court of Appeals, Second Circuit. There it was held that payment by a taxpayer to the Office of Price Administration in settlement of a cause of action for price ceiling violations voluntarily disclosed by the taxpayer, because it was impractical to return overcharges to customers, was not a "penalty" and could be deducted as an ordinary and necessary business expense in computing Federal income taxes under Section 23(a) (1) (A) of the Internal Revenue Code. The Court said, 175 F.2d 711, at 713–714,—and we quote at considerable length because we believe the facts in that case are somewhat similar to those before us: "The Revenue Act does not declare that penalties may not be deducted; the doctrine is a judicial gloss—and, for that matter, a gloss of the lower courts only, save as the Supreme Court recognized it by implication in Commissioner [of Internal Revenue] v. Heininger. We agree that it is a proper gloss (indeed we have ourselves enforced it several times); and its justification is that, when acts are condemned by law and their commission is made punishable by fines or forfeitures, to allow these to be deducted from the wrongdoer's gross income, reduces, and so in part defeats, the prescribed punish-

ment. Obviously, to relieve the wrong-doer of a part of the tax due upon his income, in effect is to remit that much of the sanction imposed; as would at once be apparent if we were to compare the case of a wrongdoer who has an income with that of one who has none. Hence, if one rigorously applied the doctrine, a taxpayer could never deduct the payment of fines and forfeitures; and we can see no relevant distinction between them and legal expenses incurred in an unsuccessful effort to prevent their collection. Indeed, to hold otherwise would be to subsidize the obduracy of those offenders who were unwilling to pay without a contest and who therefore added impenitence to their offense; and for this reason in the decisions just cited we held that such legal expenses were never deductible. The Supreme Court overruled this doctrine in Commissioner [of Internal Revenue] v. Heininger, supra; and the question is as to the scope of that decision. It is possible to read it as distinguishing between the legal expenses of an unsuccessful defense and the payment of fines or forfeitures. On the other hand, it is also possible to read it as meaning that, whether the claimed deduction be of legal expenses or of fines or forfeitures, its allowance depends upon the place of sanctions in the scheme of enforcement of the underlying act. We think that the second is the right reading; in short that there are 'penalties' and 'penalties,' and that some are deductible and some are not. This we infer, not only because the result of denying deductibility only to legal expenses would, as we have said, put a premium upon resistance, but because of the following language, which was the kernal of the ratio decidendi: 'If the respondent's litigation expenses are to be denied deduction, it must be because the allowance of the deduction would frustrate the sharply defined policies * * * which authorize the Postmaster General to issue fraud orders.' 320 U.S. at page 474, 64 S.Ct. at page 254, 88 L.Ed. 171. Again: 'We hold therefore that the Board of Tax Appeals was not required to regard the administrative finding of guilt * * * as a rigid criterion of the deductibility of the respondent's litigation expenses.' 320 U.S. at page 475, 64 S.Ct. at page 254, 88 L.Ed. 171. * *

"This conclusion leads directly to the third question: whether, even though the overcharge was a 'penalty,' its allowance as a deduction would 'frustrate' any 'sharply defined policies' of the Emergency Price Control Act of 1942. It is impossible to find an answer in general terms; indeed any answer goes to the very root of one's theory of criminal law. Happily, in the case at bar, we are not left to speculation, for we have an answer from the best possible source —the Administrator himself. The body of regulations, by which the United States sought to control prices during the last war, was extraordinarily complicated and difficult to comprehend. That was inevitable; the innumerable varieties of commercial transactions to be covered made possible nothing simpler. One may indeed argue, as the Commissioner does, that the more unsparing and relentless was the pursuit of offenders, however innocent they may have been of any wilful violation of the regulations, the more solicitous would they become to comply, and the more effective would be the enforcement of the Act. * * * He thought that Congress had given him discretion not to sue for 'treble damages' in some instances, and he had exercised that discretion so as 'to avoid undue hardship in deserving cases.' In short, he did not believe that it paid to sweep into the same pool with wilful or careless violators, violators for whom the daedalian mazes of the regulations had proved too much. Moreover Congress showed in 1944 by the amendment of § 205(e) that it agreed with the Administrator. It seems to us that we should accept these expressions as evidence that in cases where the Administrator accepted the overcharge as sufficient, it did not 'frustrate' any 'sharply defined' policies of the Emergency Price Control Act of 1942.

"Hence, we hold erroneous the order assessing the deficiency. First, we say that on no theory was the payment of the overcharge to the United States the payment of a 'penalty.' Second, we say that, even if it was the payment of a 'penalty,' that is not a 'rigid criterion' of its deductibility. Third, we say that there was positive and compelling evidence that to allow such a deduction would not 'frustrate' the policies of the underlying act."

Counsel for the Government rely primarily upon National Brass Works v. Commissioner, 182 F.2d 526, 20 A.L.R.2d 590, and 205 F.2d 104, decisions of the Court of Appeals for the Ninth Circuit. In this case, the National Brass Works, Inc. filed a petition against the Commissioner of Internal Revenue to review a decision of the Tax Court of the United States to the effect that the Commissioner's determination of a deficiency in that company's income tax for the year 1944 was correct. The Court of Appeals held that a payment by the taxpayer to the Office of Price Administration in settlement of a suit for price ceiling violations, even if construed as a penalty, could be deducted as an ordinary and necessary business expense in computing income taxes, provided it be established that such overcharge had been innocently and unintentionally made and not made by an unreasonable lack of care. The Court said, 182 F.2d 526, 529–531,— and we quote at considerable length from this opinion because the facts in this case are also somewhat similar to those before us: "This country has experienced no more complicated and involved regulation of business than that invoked as a war measure to combat inflation through price control. The hazards of inadvertent violation became a common business risk to such an extent as to be the subject of congressional debate and remedy. 'The daedalian mazes of the regulations' [quoting from Jerry Rossman Corp. v. Commissioner, supra, 175 F.2d 714] proved too much for many persons. See also Samuel v. United States, 9 Cir., 1948, 169 F.2d 787, 791.

"But respondent insists that the civil liability to the government for price violations, as provided for in Section 205(e) of the Price Control Act, was imposed as a 'penalty' and hence by reason of an asserted rule that statutory penalties are not deductible from gross income, payments in satisfaction of such liability are not deductible. * * * Petitioner argues that such liability was not intended to be a 'penalty', at any rate to the extent the amount paid represents overcharges..

"While it would perhaps be convenient to attach a tag or label to civil liability for price violations, to do so by the use of the term 'penalty' confuses more than it simplifies. What is considered a penalty differs with circumstances and viewpoints. That a payment was or was not in the nature of a penalty would give no quick nor sound answer to deductibility. However, if we had to decide the nature of damage payments to the government under Section 205(e), we would liken them to penalties for the reasons expressed in Porter v. Montgomery, 3 Cir., 1947, 163 F.2d 211. We doubt that 205(e) was in any respect intended to provide for restitution.

"The real reason for denying the deductibility of 'penalties' is not that they are characterized as such but because allowance in many cases would be against public policy. As the Supreme Court stated it in Commissioner of Internal Revenue v. Heininger, 1943, 320 U.S. 467, 473, 64 S.Ct. 249, 253, 88 L.Ed. 171, a tax deduction must not 'frustrate [any] sharply defined * * * policies' of the sovereign. It is true that neither the tax statute nor the treasury regulations condition deductibility upon the lawful character, either directly or remotely, of the expenditure made. Compare Textile Mills Securities Corp v. Commissioner, supra. But, in the nature of things, public policy must narrow the field of allowable deductions which rest as they do upon legislative indulgence.

"Study convinces us that, in these circumstances, an expense is ordinary and necessary if commonly experienced in

the community, provided that the expenditure does not frustrate the purposes of a statute or violate public policy. * * *

" * * * The law violated was highly complex and difficult to comprehend and therefore innocent violations were not uncommon. It was error in our opinion to conclude simply because the Price Control Act was admittedly violated and the expenditure was incurred as a direct consequence thereof that such expenditure was non-deductible for income tax purposes.

"It seems to us that allowance of the sum paid to the government may be allowed as a business deduction when the overcharge has been innocently and unintentionally made and not made through an unreasonable lack of care. The whole question resolves itself into proof with the burden on the claimant. * * *

"Where the payment has been made in circumstances which are inconsistent with intention to violate the Act and inconsistent with a lack of due care to conform to the law it would be an ordinary and necessary expense. Allowance of the deduction in these circumstances could not frustrate the enforcement of the Act."

Accordingly, the Tax Court ruling was reversed and the case was remanded to the Tax Court for further proceedings, in conformity with the appellate court's opinion from which we have just quoted.

Upon remand the Tax Court took evidence and made findings of fact upon which it concluded that the taypayer had not acted unintentionally or innocently; that, in fact, the overcharges had been fully considered and acted upon with advice of counsel, which was not entirely followed; that petitioner purposely, deliberately and knowingly failed to comply with the price regulation, and the Tax Court accordingly held that the payment to the O.P.A. was not a necessary business expense. Thereupon, the taxpayer brought the case again before the Court of Appeals for review. The appellate court affirmed the Tax Court's decision. 16 T.C. 1051. National Brass

Works v. Commissioner, 9 Cir., 205 F. 2d 104. In the appellate court's opinion, the Tax Court's findings and conclusions on remand are fully set forth. It does not appear necessary to quote them here. Suffice it to quote the following from the opinion, 205 F.2d 104, at pages 106–107: "Petitioner says there is no evidence supporting the finding that petitioner intended to violate the Act. To begin with, petitioner did violate the Act in that it did not reduce its prices as directed by the Office of Price Administration. And we must keep in mind that it was petitioner's burden to show that the violation was unintentional. Petitioner argues that simply because it charged one and one-half cents more than the ceiling price it does not necessarily follow that there was an intention to violate the Act. We agree; we remanded the case for the Tax Court to consider the possibility that the overcharges had been made unintentionally, through misunderstanding of a complicated statute, or otherwise. It will be noticed that there is no proof of confusion as to the meaning of the regulation under which petitioner knew it must act, rather, petitioner relies upon its belief that the regulation and the order under it worked an inequitable result as to the petitioner. But a claim of inequity cannot justify a violation of an order. Taking the law into its own hands would frustrate the policies of the United States in its effort to prevent wartime inflation.

"The fact that petitioner acted on advice of counsel was considered by the Tax Court. The evidence shows that petitioner's attorney advised it to seek redress directly from the O.P.A. And, while its attorney further suggested that petitioner make a full reduction on all new business and no reduction on the price of business already on the books, there is no evidence that the attorney suggested that such an arrangement would be in full compliance with the law. The suggestion appears to have been made only as a business expedient which would make any net adjustment very

small if and when the O.P.A. should give retroactive approval to petitioner's acts.

"The fact that petitioner offered to make restitution to its customers after the O.P.A. investigators had discovered the overcharges, is as consistent with the government's theory that petitioner sought to extricate itself from an unfavorable position as it is with petitioner's theory that such fact is evidence of its innocence. The Tax Court followed the government's theory. It is not our function to retry the case. Unless clear error appears, we cannot disturb a Tax Court's finding or conclusion. We find no clear error here. * * * Petitioner argues that the Administrator's satisfaction with the exact amount of the overcharge is conclusive proof that petitioner did not act wilfully nor without practicable precautions. Petitioner's argument is not supported by the statute. The Administrator is *empowered* to recover 'not more than three times the amount of the overcharge'. He is *not required* to collect treble damages, and may thus exercise his discretion. The proviso prohibiting treble damages in specified circumstances is undoubtedly entitled to consideration as a possible guide by which the Administrator was motivated; however, it is not conclusive. In any event, the proviso was considered by the Tax Court, and we cannot say that the Tax Court erred in concluding from all the evidence that petitioner failed to establish its innocence and due care.

"Both parties cite Jerry Rossman Corp. v. C. I. R., 2 Cir., 1949, 175 F.2d 711, to support their respective positions. Rossman Corporation was a 'converter' of 'greige goods' which shrink or stretch in the process of dyeing, to an extent not determinable in advance. It *'unwittingly* overcharged its customers' [emphasis ours] by accepting shrinkage figures given it by the 'finishers' to whom it had sent the goods to be dyed and thus claiming larger shrinkage than the O.P.A. regulations allowed. Furthermore, Rossman Corporation voluntarily reported its overcharges to the O.P.A. as soon as the mistake was discovered. In our case, as we have seen, petitioner's overcharges were not unwittingly made."

The facts in the Jerry Rossman Corporation and in the National Brass Works cases, which we have just analyzed, are more akin to those in the present case than the facts in any of the other decisions to which we have been referred. We find nothing in the facts or the reasoning in those other decisions that calls for an analysis of them. For example, Commissioner of Internal Revenue v. Pacific Mills, 1 Cir., 207 F.2d 177, upon which counsel for the Brewery also relies, involves facts that are distinctly different. We are satisfied that the factual situation in the present case, while somewhat similar to that in both the Jerry Rossman Corporation and the National Brass Works cases, nevertheless, embrace some material differences. In short, we believe that the facts before us present a situation which lies between these two cases on their facts.

In the Jerry Rossman Corporation case, it was found that the corporation had "unwittingly" overcharged its customers and that it had voluntarily reported its overcharges to the O.P.A. as soon as the mistake was discovered. "Unwittingly" means "unconsciously", "inadvertently". In the case before us, the overcharge was not unconsciously or inadvertently made, but was based upon the conclusion of the taxpayer's officials that the situation was not covered by any statute or regulation, although they had been told by the O.P.A. that it was so based. On the other hand, there was ground for confusion as to the scope of the law and the regulation. This Court so thought, and stated in its opinion, Bowles v. American Brewery, 56 F. Supp. 82, at page 86, that "there is a total absence of any showing of wilful attempt on the part of the defendant to evade the law. On the contrary, there is every evidence of a desire to comply with the law if, and when properly as-

sisted in understanding its complicated and perplexing structure." The appellate court, in its opinion made no finding of wilfulness, and found the question sufficiently complex to warrant an extensive opinion as to (1) whether a ceiling price for the malt syrup had been established, and (2) whether such ceiling price had been repealed or suspended. Furthermore, as we have already pointed out, local counsel for the Price Administrator, in the course of the original proceeding before this Court, admitted in argument that "This case, on the merits, is a hardship case", and that the violations were "innocent and unintentional and excusable." On the other hand, a claim of hardship or inequity through obedience to the law is not alone a sufficient answer to the present problem.

As respects the facts in the National Brass Works case, the appellate court found that when the Tax Court held that the taxpayer had not acted unintentionally but purposely, deliberately and knowingly, it had conformed to the rule laid down by the appellate court as to the burden of proof that rested upon the taxpayer; also, that there was no proof of confusion as to the meaning of the regulation under which the taxpayer knew it must act, but that the taxpayer relied upon its belief that the regulation and the order issued thereunder worked an inequitable result as respects the taxpayer.

The present case may be said to be a borderline one. As we understand the decisions of the Supreme Court, the test prescribed by which we must determine whether the Brewery is entitled to make the claimed tax deduction, is this: would such deduction, if allowed, frustrate the purposes of the Emergency Price Control Act, or violate public policy? If it would, then the tax deduction should not be allowed. The answer to this question lies in the answer to a further question: was the overcharge made by the Brewery unintentionally made, and not through an unreasonable lack of care? The burden of proof has rested on the Brewery to establish that this question must be answered in the affirmative. We are not satisfied that the Brewery has met this burden. To be sure, it had a right to contest the ruling of the O.P.A. Nevertheless, the overcharge was not in fact unintentionally, but deliberately made, in the sense that it was known to be contrary to instructions from the O.P.A.,—albeit (1) the officials of the Brewery were believed by this Court in the first litigation to have been sincere and justified in resisting the Government's position because this Court had felt, contrary to what the Court of Appeals ultimately decided, that barley malt syrup had not been brought under price regulation during the period in question; and (2) in the first litigation, Government counsel stated that the overcharges by the Brewery were "innocent, unintentional and excusable." The issue here is of course not the same as that in the suit brought by the Government against the Brewery for price violation. There, the issue involved enforcement of legislation believed by Congress to be vital to the War effort. Although price regulation has disappeared in the limbo with other War legislation, we cannot say, even at this late date, that to allow the Brewery to make the claimed deduction would not frustrate a fundamental purpose of the Emergency Price Control Act, or violate public policy. The question presented of necessity involves looking back to the period of World War II.

For the reasons herein set forth, the complaint must be dismissed.