HAUPT *v.* UNITED STATES.

No. 49.   Argued November 21, 22, 1946.—Decided March 31, 1947.

*Paul A. F. Warnholtz* argued the cause and filed a brief for petitioner.

*Frederick Bernays Wiener* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Robert S. Erdahl, Irving S. Shapiro* and *Beatrice Rosenberg.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

Petitioner, Hans Max Haupt was indicted for treason, convicted and sentenced to life imprisonment and to pay a fine of $10,000. From this judgment of the District Court for the Northern District of Illinois he appealed to the United States Circuit Court of Appeals for the Seventh Circuit, which by a divided court affirmed. 152 F. 2d 771. A previous conviction of the same offense predicated on the same acts had been reversed. *United States* v. *Haupt,* 136 F. 2d 661.

Petitioner is the father of Herbert Haupt, one of the eight saboteurs convicted by a military tribunal. See *Ex*

*parte Quirin,* 317 U. S. 1. Sheltering his son, assisting him in getting a job, and in acquiring an automobile, all alleged to be with knowledge of the son's mission, involved defendant in the treason charge.

The background facts are not in dispute. The defendant is a naturalized citizen, born in Germany. He came to this country in 1923 and lived in or near Chicago. In 1939 the son, Herbert, who had also been born in Germany, worked for the Simpson Optical Company in Chicago which manufactured lenses for instruments, including parts for the Norden bomb sight. In the spring of 1941 Herbert went to Mexico and, with the aid of the German Consul, from there to Japan and thence to Germany where he entered the employ of the German Government and was trained in sabotage work.

On the 17th of June 1942, Herbert returned to the United States by submarine. His mission was to act as a secret agent, spy and saboteur for the German Reich. He was instructed to proceed to Chicago, to procure an automobile for the use of himself and his confederates in their work of sabotage and espionage, to obtain reemployment with the Simpson Optical Company where he was to gather information, particularly as to the vital parts and bottlenecks of the plant, to be communicated to his co-conspirators to guide their attack. He came with various other instructions, equipped with large sums of money, and went to Chicago.

After some six days there, Herbert was arrested on June 27, 1942, having been under surveillance by Government agents during his entire stay in Chicago. This petitioner was thereafter taken into custody and was arraigned on July 21, 1942. He later asked to talk to an F. B. I. agent, two of whom were summoned, and he appears to have volunteered considerable information and to have given more in answer to their questions. He blamed certain others for the predicament of his son and wanted to testify against

634

them. For this purpose, he disclosed that he had been present when Herbert had told the complete story of his trip to Mexico, Japan, his return to the United States by submarine, and his bringing large sums of money with him. During his confinement in the Cook County jail, he also talked with two fellow prisoners concerning his case and they testified as to damaging admissions made to them.

The indictment alleged twenty-nine overt acts of treason. Its sufficiency was challenged by demurrer which was overruled and by a motion to quash which was denied. The defendant, at the close of the Government's case and again at the close of all the evidence, made motions for a directed verdict generally and also specifically as to each overt act charged, all of which were denied. Seventeen of the overt acts were withdrawn before submission and twelve were submitted to the jury. Generally stated, the overt acts submitted fall into three groups of charges: First, the charge that this defendant accompanied his son to assist him in obtaining employment in a plant engaged in manufacturing the Norden bomb sight; second, the charge of harboring and sheltering Herbert Haupt; and third, the charge of accompanying Herbert to an automobile sales agency, arranging, making payment for and purchasing an automobile for Herbert. Each of these was alleged to be in aid of Herbert's known purpose of sabotage.

The defendant argues here that the overt acts submitted do not constitute acts of treason, but that each is commonplace, insignificant and colorless, and not sufficient, even if properly proved, to support a conviction. We have held that the minimum function of the overt act in a treason prosecution is that it show action by the accused which really was aid and comfort to the enemy. *Cramer* v. *United States*, 325 U. S. 1, 34. This is a separate inquiry from that as to whether the acts were done because of

adherence to the enemy, for acts helpful to the enemy may nevertheless be innocent of treasonable character.

*Cramer's* case held that what must be proved by the testimony of two witnesses is a "sufficient" overt act. There the only proof by two witnesses of two of the three overt acts submitted to the jury was that the defendant had met and talked with enemy agents. We did not set aside Cramer's conviction because two witnesses did not testify to the treasonable character of his meeting with the enemy agents. It was reversed because the Court found that the act which two witnesses saw could not on their testimony be said to have given assistance or comfort to anyone, whether it was done treacherously or not. To make a sufficient overt act, the Court thought it would have been necessary to assume that the meeting or talk was of assistance to the enemy, or to rely on other than two-witness proof. Here, on the contrary, such assumption or reliance is unnecessary—there can be no question that sheltering, or helping to buy a car, or helping to get employment is helpful to an enemy agent, that they were of aid and comfort to Herbert Haupt in his mission of sabotage. They have the unmistakable quality which was found lacking in the *Cramer* case of forwarding the saboteur in his mission. We pointed out that Cramer furnished no shelter, sustenance or supplies. 325 U. S. 1, 37. The overt acts charged here, on the contrary, may be generalized as furnishing harbor and shelter for a period of six days, assisting in obtaining employment in the lens plant and helping to buy an automobile. No matter whether young Haupt's mission was benign or traitorous, known or unknown to defendant, these acts were aid and comfort to him. In the light of his mission and his instructions, they were more than casually useful; they were aid in steps essential to his design for treason. If proof be added that the defendant knew of his son's instructions, preparation

and plans, the purpose to aid and comfort the enemy becomes clear. All of this, of course, assumes that the prosecution's evidence properly in the case is credited, as the jury had a right to do. We hold, therefore, that the overt acts laid in the indictment and submitted to the jury do perform the functions assigned to overt acts in treason cases and are sufficient to support the indictment and to sustain the conviction if they were proved with the exactitude required by the Constitution.

The most difficult issue in this case is whether the overt acts have been proved as the Constitution requires, and several grounds of attack on the conviction disappear if there has been compliance with the constitutional standard of proof. The Constitution requires that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act . . . ." Art. III, § 3. We considered the application of this provision to the problems of proof in the *Cramer* case. Defendant claims this case in two respects falls short of the requirements there laid down as to all the overt acts which comprise harboring and sheltering the saboteur: First, that there was no direct proof that the saboteur was actually in the defendant's apartment, and second, that there is no direct proof that the defendant was in the apartment at any time when the saboteur was there. Both of these we find to be without merit.

The act to be proved is harboring and sheltering in the house at No. 2234 North Fremont Street. The defendant and his wife lived there in a third-floor front apartment, which had but one bedroom. Federal Bureau of Investigation agents, never less than two, had the place under continuous surveillance from 10:30 a. m., June 22 to the arrest of the saboteur on June 27, and at least two testified in minute detail to each of repeated arrivals and departures of the saboteur, on some occasions accompanied by

the defendant, on others by the defendant's wife, and on some by both. He entered each night and left each day. On some occasions he came out wearing different clothes from those he wore when he went in. When he went in at night the lights in the defendant's apartment were turned on and after a time extinguished. Two witnesses who were callers at the apartment testified that on one occasion defendant and Herbert were there together at supper time, the three Haupts being together in the kitchen, Herbert later coming into the parlor and one of the guests going into the kitchen. The defendant contends that this does not constitute the required two witnesses' direct proof that the saboteur was harbored and sheltered in the defendant's apartment. It is true that the front entrance, where all of this testimony shows the saboteur to have entered, connected with two other apartments. The occupants of each of the other apartments, two witnesses as to each, testified that the saboteur did not at any time occupy their respective apartments.

It is sufficiently proved by direct testimony of two witnesses that the saboteur stayed in the house where the father lived and with the latter's knowledge. But it is said that this is not enough, that it fails because the two witnesses did not see him enter his parents' apartment therein. But the hospitality and harboring did not begin only at the apartment door. It began when he entered the building itself where he would have no business except as a guest or member of the family of one of the tenants. It is not necessary to show that he slept in the defendant's bed. Herbert was neither trespasser nor loiterer. He entered as the licensee of his father, and was under the privileges of the latter's tenancy even in parts of the building used in common with other tenants. His entrance to and sojourn in the building were made possible by the defendant, and the saboteur slept and stayed in

some part of it with the father's knowledge and by his leave. We think the proof is sufficient to comply with the constitutional requirement that two witnesses testify to the overt acts in that group which charges harboring and sheltering of the saboteur.

The other group of submitted overt acts as to which it is claimed there is a deficiency of testimony relates to assistance which the defendant rendered to the saboteur in purchasing an automobile as alleged in Acts Nos. 15 and 16 of the indictment. According to the testimony of an automobile salesman, Farrell, the defendant came to his salesroom and said he wanted to buy a good used car of late model. Defendant selected a 1941 model Pontiac and asked about installment payments. After considerable discussion of terms, defendant paid $10 deposit on the price of $1045 and said he would come in next day to make a further payment. He signed an order for the car and gave financial references. On the next day, defendant came to the salesroom and paid an additional $405, executing notes and finance contract. The son took the car and drove it away.

A second witness, Vinson, sales manager, corroborated the earlier parts of this transaction, but defendant claims his testimony is not sufficiently comprehensive to comply with the two-witness rule, especially as to overt acts 15 and 16, relating to events of the second day. Vinson at first said he did not see defendant and his son on that day. The trial court allowed counsel to refresh Vinson's recollection from his testimony given at the former trial of defendant. Vinson then testified that he did see the defendant and his son come in together and be together in the salesroom that evening but did not talk with them; that he received "the money that had been put down" on that evening and the note signed by the defendant. By approval of his answers at the former trial he affirmed that

he receipted for the money. He also saw the invoice made that evening for the purchase and identified a copy of the bill of sale of the car to the defendant. He testified Farrell was there when the Haupts were.

It is said that Vinson's testimony falls short because it is not explicit as to who paid the money. Taking the testimony as a whole, Vinson has corroborated Farrell's testimony that the defendant came that night to the automobile salesroom, that he was accompanied by the saboteur, that a purchase of the automobile had been started and was pending. The partially completed transaction was one in which defendant himself became purchaser, signed his own name to the purchase note and furnished his own, not his son's, financial references. Vinson's testimony shows that this pending transaction was consummated on the latter night. It involved "a further payment in cash toward the purchase" and completing "arrangements for the purchase" which are alleged as the sixteenth act. Vinson said that he received the money. Whoever actually handed over the money, it was apparently in defendant's presence and was paid on account of his obligation incurred the previous evening in signing the purchase contract.

The testimony of Vinson in its interpretation most favorable to the jury's verdict seems clearly to have been testimony to the same overt act as that by Farrell. Defendant's counsel made no effort to correct any ambiguity in it by cross-examination. The defense of course is under no duty to do so; it may rely upon weakness in the prosecution's case. But it takes the risk, when it relies on an ambiguity rather than on a complete lack of legal proof, that the jury will resolve the meaning in favor of the prosecution. When enough has been shown to make a case for the jury, we may not impeach the verdict by differing from them on equally reasonable views of a wit-

ness' meaning. We think the court was justified in submitting this overt act and the jury was justified in finding it proved.

The Constitution requires testimony to the alleged overt act and is not satisfied by testimony to some separate act from which it can be inferred that the charged act took place. And while two witnesses must testify to the same act, it is not required that their testimony be identical. Most overt acts are not single, separable acts, but are combinations of acts or courses of conduct made up of several elements. It is not easy to set by metes and bounds the permissible latitude between the testimony of the two required witnesses. It is perhaps easier to say on which side of the line a given case belongs than to draw a line that will separate all permissible disparities from forbidden ones. Concrete even if hypothetical cases may illustrate this.

One witness might hear a report, see a smoking gun in the hand of defendant and see the victim fall. Another might be deaf, but see the defendant raise and point the gun, and see a puff of smoke from it. The testimony of both would certainly be "to the same overt act," although to different aspects. And each would be to the overt act of shooting, although neither saw the movement of a bullet from the gun to the victim. It would still be a remote possibility that the gun contained only a blank cartridge and the victim fell of heart failure. But it is not required that testimony be so minute as to exclude every fantastic hypothesis that can be suggested.

We think two witnesses testified to these overt acts and petitioner cannot seriously contend that two did not testify to each of the overt acts comprising the group of charges on obtaining a job. Since this was the constitutional measure of evidence as to each overt act submitted to the jury, we do not reach the question whether

the conviction could stand on some sufficiently proven acts if others failed in proof.[1]

It is urged that the conviction cannot be sustained because there is no sufficient proof of adherence to the enemy, the acts of aid and comfort being natural acts of aid for defendant's own son. Certainly that relationship is a fact for the jury to weigh along with others, and they were correctly instructed that if they found that defendant's intention was not to injure the United States but merely to aid his son "as an individual, as distinguished from assisting him in his purposes, if such existed, of aiding the German Reich, or of injuring the United States, the defendant must be found not guilty." The defendant can complain of no error in such a submission. It was for the jury to weigh the evidence that the acts proceeded from parental solicitude against the evidence of adherence to the German cause. It is argued that Haupt merely had

---

[1] When, speaking of a general verdict of guilty in *Cramer* v. *United States*, 325 U. S. 1, 36, n. 45, we said "Since it is not possible to identify the grounds on which Cramer was convicted, the verdict must be set aside if any of the separable acts submitted was insufficient," of course we did not hold that one overt act properly proved and submitted would not sustain a conviction if the proof of other overt acts was insufficient. One such act may prove treason, and on review the conviction would be sustained, provided the record makes clear that the jury convicted on that overt act. But where several acts are pleaded in a single count and submitted to the jury, under instructions which allow a verdict of guilty on any one or more of such acts, a reviewing court has no way of knowing that any wrongly submitted act was not the one convicted upon. If acts were pleaded in separate counts, or a special verdict were required as to each overt act of a single count, the conviction could be sustained on a single well-proved act. As the acts were here pleaded in a single count, and the jury were instructed that they could convict on any one, we would have to reverse if any act were insufficient or insufficiently proved. *Cf. Stromberg* v. *California*, 283 U. S. 359, 368; *Williams* v. *North Carolina*, 317 U. S. 287, 292, and *Cramer* v. *United States, supra.*

the misfortune to sire a traitor and all he did was to act as an indulgent father toward a disloyal son. In view however of the evidence of defendant's own statements that after the war he intended to return to Germany, that the United States was going to be defeated, that he would never permit his boy to join the American Army, that he would kill his son before he would send him to fight Germany, and others to the same effect, the jury apparently concluded that the son had the misfortune of being a chip off the old block—a tree inclined as the twig had been bent—metaphors which express the common sense observation that parents are as likely to influence the character of their children as are children to shape that of their parents. Such arguments are for the jury to decide.

It is also urged that errors were made in admission of evidence. Some of this concerned conversations and occurrences long prior to the indictment which were admitted to prove intent. They consisted of statements showing sympathy with Germany and with Hitler and hostility to the United States. Such testimony is to be scrutinized with care to be certain the statements are not expressions of mere lawful and permissible difference of opinion with our own government or quite proper appreciation of the land of birth. But these statements were explicit and clearly were admissible on the question of intent and adherence to the enemy. Their weight was for the jury.

Evidence of F. B. I. agents and of defendant's fellow prisoners as to conversations is also said to be inadmissible. The Constitution requires that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." It is claimed that the statements of defendant were confessions, and as they were not made in open court were inadmissible as evidence. If there were not

the required two-witness testimony and it was sought to supply that defect by confession, we would have a different question. But having found the legal basis for the conviction laid by the testimony of two witnesses, we find nothing in the text or policy of the Constitution to preclude using out-of-court admissions or confessions.

It may be doubted whether the Constitutional reference to confession in open court has application to any admission of a fact other than a complete confession to guilt of the crime. The statements of defendant did not go so far. They were admissions of specific acts and knowledge as to which, insofar as they were overt acts charged, the required two witnesses also testified. There has been no attempt to convict here on such admissions alone, or to use the admissions to supply defects in the Constitutional measure of proof. If such an attempt were made we would be faced with a novel question. But here the admissions are merely corroborative of a legal basis laid by testimony and the Constitution does not preclude using out-of-court admissions or confessions in this way. *Cf. Respublica* v. *Roberts,* 1 Dall. 39; *Case of Fries,* Fed. Case No. 5126, 9 Fed. Cas. 826, 909.

There are many other complaints about the conduct of the trial, such as permitting the indictment to go to the jury room, allowing the jury to have a typewritten copy of the court's charge, holding the jury together for a long time, reading the testimony of certain witnesses to the jury at its request and failing to order a special verdict. We find nothing in any of them to warrant the inference of unfairness or irregularity in the trial. It is also claimed that the prosecution made improper appeals to passion. Unfortunately it is the nature of the charge of betrayal that it easily stirs feelings, and that is one of the reasons such safeguards have been thrown around its trial. But we find no such conduct as would invalidate the conviction.

Haupt has been twice tried and twice found guilty. The law of treason makes, and properly makes, conviction difficult but not impossible. His acts aided an enemy of the United States toward accomplishing his mission of sabotage. The mission was frustrated but defendant did his best to make it succeed. His overt acts were proved in compliance with the hard test of the Constitution, are hardly denied, and the proof leaves no reasonable doubt of the guilt.

The judgment is

*Affirmed.*

MR. JUSTICE DOUGLAS.

There is a close parallel between this case and *Cramer* v. *United States,* 325 U. S. 1.

Two witnesses saw Cramer talking with an enemy agent. So far as they knew, the conversation may have been wholly innocent, as they did not overhear it. But Cramer, by his own testimony at the trial, explained what took place: he knew or had reason to believe that the agent was here on a mission for the enemy and arranged, among other things, to conceal the funds brought here to promote the project. Thus there was the most credible evidence that Cramer was guilty of "adhering" to the enemy, giving him "aid and comfort." Article III, § 3 of the Constitution. And the overt act which joined him with the enemy agent was proved by two witnesses. Cramer's conviction, however, was set aside because two witnesses did not testify to the treasonable character of Cramer's meeting with the enemy agent.

Two witnesses saw the son enter Haupt's apartment house at night and leave in the morning. That act, without more, was as innocent as Cramer's conversation with the agent. For nothing would be more natural and normal, or more "commonplace" (325 U. S. p. 34), or less suspicious, or less "incriminating" (325 U. S. p. 35), than

the act of a father opening the family door to a son.   That act raised, therefore, no more implication that the father was giving his son aid and comfort in a treasonable project than did the meeting of the defendant with the enemy agent in the *Cramer* case.   But that act, wholly innocent on its face, was shown to be of a treasonable character, not by the two witnesses, but by other evidence: that Haupt was sympathetic with the Nazi cause, that he knew the nature of his son's mission to this country.   Haupt's conviction is sustained, though the conversion of an innocent appearing act into a treasonable act is not made by two witnesses.

The Constitution provides:

> "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort.   No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."   Article III, § 3.

As the *Cramer* case makes plain, the overt act and the intent with which it is done are separate and distinct elements of the crime.   Intent need not be proved by two witnesses but may be inferred from all the circumstances surrounding the overt act.   But if two witnesses are not required to prove treasonable intent, two witnesses need not be required to show the treasonable character of the overt act.   For proof of treasonable intent in the doing of the overt act necessarily involves proof that the accused committed the overt act with the knowledge or understanding of its treasonable character.

The requirement of an overt act is to make certain a treasonable project has moved from the realm of thought into the realm of action.   That requirement is undeniably met in the present case, as it was in the case of *Cramer*.

The *Cramer* case departed from those rules when it held that "The two-witness principle is to interdict impu-

tation of *incriminating acts* to the accused by circumstantial evidence or by the testimony of a single witness." 325 U. S. p. 35. The present decision is truer to the constitutional definition of treason when it forsakes that test and holds that an act, quite innocent on its face, does not need two witnesses to be transformed into an incriminating one.

MR. JUSTICE MURPHY, dissenting.

This case grows out of a singular set of circumstances that, when combined with the serious nature of the alleged crime, warrants extraordinary scrutiny. Petitioner's son was tried as a saboteur before a military tribunal, convicted and executed. See *Ex parte Quirin,* 317 U. S. 1. Petitioner, his wife and four others were then jointly tried for treason. All were convicted, petitioner being sentenced to death and his wife to 20 years' imprisonment. *United States* v. *Haupt,* 47 F. Supp. 832; 47 F. Supp. 836. These convictions, however, were reversed upon appeal. *United States* v. *Haupt,* 136 F. 2d 661. Petitioner has now been retried separately for treason; again he has been found guilty, with the sentence being reduced to life imprisonment and a $10,000 fine. 152 F. 2d 771.

Petitioner was charged with having committed three general types of overt acts of treason: (1) harboring and sheltering his son; (2) assisting his son in obtaining reemployment; (3) accompanying and assisting his son in the purchase of an automobile. All of these alleged overt acts were contained in a single count of the indictment and the jury's verdict was a general one. The Court indicates that a fatal deficiency as to any of the alleged overt acts under such circumstances invalidates the conviction. Since the acts relating to the harboring and sheltering of petitioner's son did not, in my opinion, amount to overt acts of treason, I would accordingly reverse the judgment below, regardless of the sufficiency of the other acts.

The high crime of treason, as I understand it, consists of an act rendering aid and comfort to the enemy by one who adheres to the enemy's cause. *Cramer* v. *United States,* 325 U. S. 1. The act may be one which extends material aid; or it may be one which merely lends comfort and encouragement. The act may appear to be innocent on its face, yet prove to be treasonable in nature when examined in light of its purpose and context.

It does not follow, however, that every act that gives aid and comfort to an enemy agent constitutes an overt act of treason, even though the agent's status is known. The touch of one who aids is not Midas-like, giving a treasonable hue to every move. An act of assistance may be of the type which springs from the well of human kindness, from the natural devotion to family and friends, or from a practical application of religious tenets. Such acts are not treasonous, however else they may be described. They are not treasonous even though, in a sense, they help in the effectuation of the unlawful purpose. To rise to the status of an overt act of treason, an act of assistance must be utterly incompatible with any of the foregoing sources of action. It must be an act which is consistent only with a treasonable intention and with the accomplishment of the treasonable plan, giving due consideration to all the relevant surrounding circumstances. Thus an act of supplying a military map to a saboteur for use in the execution of his nefarious plot is an overt act of treason since it excludes all possibility of having been motivated by non-treasonable considerations. But an act of providing a meal to an enemy agent who is also one's son retains the possibility of having a non-treasonable basis even when performed in a treasonable setting; accordingly, it cannot qualify as an overt act of treason.

It is true that reasonable doubts may be raised as to whether or not the prime motive for an act was treasonous.

Yet the nature of some acts is such that a non-treasonous motive cannot be completely dismissed as a possibility. An overt act of treason, however, should rest upon something more substantial than a reasonable doubt. Treason is different from ordinary crimes, possessing unique and difficult standards of proof which confine it within narrow spheres. It has such serious connotations that its substance cannot be left to conjecture. Only when the alleged overt act manifests treason beyond all reasonable doubt can we be certain that the traitor's stigma will be limited to those whose actions constitute a real threat to the safety of the nation.

Tested by that standard, the conviction in the instant case cannot be sustained. Petitioner, it is said, had the misfortune to sire a traitor. That son lived with petitioner and his wife in their Chicago apartment. After a sojourn in Germany for training as a saboteur, the son returned to the Chicago apartment and began to make preparations to carry out his mission of sabotage. It is claimed that petitioner knew of his son's activities and desired to help him. For six days prior to his arrest, the son lived in petitioner's apartment; he was not secreted in any way, coming and going as he normally would have done.

The indictment alleged that petitioner committed an overt act of treason by sheltering and harboring his son for those six days. Concededly, this was a natural act for a father to perform; it is consistent with parental devotion for a father to shelter his son, especially when the son ordinarily lives with the father. But the Court says that the jury might find, under appropriate instructions, that petitioner provided this shelter, not merely as an act of an indulgent father toward a disloyal son, but as an act designed to injure the United States. A saboteur must be lodged in a safe place if his mission is to be effected and the jury might well find that petitioner lodged his son for that purpose.

But the act of providing shelter was of the type that might naturally arise out of petitioner's relationship to his son, as the Court recognizes. By its very nature, therefore, it is a non-treasonous act. That is true even when the act is viewed in light of all the surrounding circumstances. All that can be said is that the problem of whether it was motivated by treasonous or non-treasonous factors is left in doubt. It is therefore not an overt act of treason, regardless of how unlawful it might otherwise be.