**UNITED STATES v. TOMOYA KAWAKITA.**

Cr. 19665.

United States District Court,
S. D. California. Central Division.

Dec. 12, 1952.

Walter S. Binns, U. S. Atty., and Ray H. Kinnison, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Morris Lavine and A. L. Wirin, Los Angeles, Cal., for defendant.

MATHES, District Judge.

By unanimous verdict of the jury, following some ten weeks of trial, the defendant was convicted in 1948 of eight overt acts of treason against the United States. United States v. Tomoya Kawakita, D.C. S.D.Cal.1950, 96 F.Supp. 824, 859–861. Our law provides that whoever is guilty of treason shall suffer death or, in the discretion of the court, shall be imprisoned not less than five years and fined not less than $10,000, and shall be incapable of holding any office under the United States. 18 U.S.C., 1948 Ed., § 2381; id. (1927 Ed.) § 2.

It was the judgment of this court that the defendant should suffer death for his treason and sentence was imposed accordingly. United States v. Tomoya Kawakita, supra, D.C., 96 F.Supp. at pages 860–861. The defendant appealed to the United States Court of Appeals and that court affirmed the judgment. Kawakita v. United States, 9 Cir., 1951, 190 F.2d 506.

The defendant then appealed to the Supreme Court of the United States and the judgment was again affirmed. Tomoya Kawakita v. United States, 1952, 343 U.S. 717, 72 S.Ct. 950. A petition for a rehearing was filed and the Supreme Court has recently denied that petition, 344 U.S. 850, 73 S. Ct. 5.

Having exhausted every avenue for judicial review of his conviction, the defendant now presents to this court a motion to modify the sentence of death imposed more than four years ago. The Government opposes the motion.

Rule 35 of the Federal Rules of Criminal Procedure, 18 U.S.C., provides *inter alia* that: "The court may reduce a sentence within 60 days after * * * receipt by the court of a mandate issued upon affirmance of the judgment * * *."

One of the principal grounds urged in support of the defendant's motion to reduce the sentence is the fact that the Japanese commander of the prisoner-of-war camp at Oeyama, Japan—where the defendant was employed as a civilian interpreter by a private mining corporation known as The Oeyama Nickel Industry Co., Ltd., during the period when the acts of treason were committed—received only a fifteen-year sentence of imprisonment following conviction of war crimes involving mistreatment of the American prisoners of war.

The argument thus advanced overlooks entirely the fact that the status of the camp commander was that of enemy alien owing no allegiance to the United States, while the status of the defendant was that of an American citizen owing full allegiance to this country. See Tomoya Kawakita v. United States, supra, 343 U.S. at page 736, 72 S.Ct. 950.

It was pointed out at time of sentence that the punishment is not for brutalities involved in the defendant's treatment of American prisoners of war. As the court then said: "The defendant stands here convicted of the crime of treason. * * * His crime is not against a few American prisoners of war. His crime is against the whole people of this country where he was born * * *." United States v. Tomoya Kawakita, supra, 96 F.Supp. at page 860.

Treason is the only crime defined in the Constitution. Since the founding of our National Government, Article III, § 3 of the Constitution has provided that: "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."

Likewise, since 1790, § 1 of the Criminal Code has provided in substance that: "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason". 18 U.S.C., 1927 Ed., § 1; id., 1948 Ed., § 2381.

Early in our national life Mr. Chief Justice Marshall wrote: "As there is no crime which can more excite and agitate the passions of men than treason, no charge demands more from the tribunal before which it is made, a deliberate and temperate inquiry. Whether this inquiry be directed to the fact or to the law, none can be more solemn, none more important to the citizens or to the government; none can more affect the safety of both." Ex parte Bollman, 1807, 4 Cranch 75, 8 U.S. 75, 125, 2 L.Ed. 554.

The wise caution of the venerable Chief Justice is as timely today as it was in 1807.

The treason of which the defendant stands convicted is that he adhered to the enemies of the United States, giving them aid and comfort in Japan.

Born in America, reared in America, educated in the public schools of America, the defendant, like the classic traitor of all time, "was numbered with us." [Acts 1:17.] He had lived most of his life among us; had been fed by our land; had been nurtured by our institutions; had enjoyed the privileges of American citizenship. Exercising one of the privileges of that citizenship, he went to Japan in 1939 under the protection of an American passport.

After almost two years in Japan, the defendant renewed his American passport and at that time made solemn oath to support and defend the Constitution of the United States against all enemies foreign and domestic and to bear true faith and allegiance to the same; and further swore that he took this obligation freely, without any mental reservation or purpose of evasion.

■ Following Pearl Harbor, the defendant was caught in the maelstrom of war between the United States and Japan. His allegiance was claimed by the law of both countries. Because born the son of Japanese nationals, he was a Japanese subject according to the law of Japan. Because born on American soil, he was an American citizen by birth according to our law.

But the defendant was not a poor illiterate who knew not what to do. Graduate of an American high school and a Japanese

university, he was trained in the languages and customs of both countries. The documentary evidence shows that in 1942 and 1943 at Meiji University, Tokyo, he was graded "good" in "civil law" and "commercial law," and "excellent" in "outline of law," "controlled economy," "military training," and "maneuvers."

It has always been comparatively easy to acquire American citizenship, and even easier to lose it. The right of expatriation is declared by our law to be "a natural and inherent right of all people". 8 U.S.C.A. § 800. The evidence leaves no doubt but that the defendant knew these things. He knew it was his unquestioned right to renounce at any time all duty of allegiance to this country. But he also knew that if he cast off his allegiance to the United States, he would at that moment lose all the rights and privileges of an American citizen.

Affidavits and other documents submitted by him to the American Consul at Yokohama after the Japanese surrender show that —far from renouncing American nationality during his sojourn in Japan—the defendant avoided any act of record which would result in loss of his American citizenship.

In 1940 the defendant registered in Japan as an American citizen under the Japanese Alien Registration Law. But he made no record of his Japanese parentage in the Japanese census register until 1943—after he had passed the military age for conscription in Japan. Then he entered gainful private employment with the Japanese mining company at Oeyama. As interpreter for that company, and thus facilitating exploitative use of the labor of American prisoners of war, the defendant was selling knowledge of the English language which he had gained in the public schools of America. [See Flory, Prisoners of War, 71–82 (1942).]

But the defendant was not content with doing only what his duties as interpreter required of him. Instead, he violated his oath of allegiance to the United States, transferred his loyalty to the enemy, and actively cast his lot with those then engaged in a life and death effort to destroy the country of his birth. The zeal with which the defendant practiced his treachery is witnessed in many ways, but perhaps most eloquently by the nicknames—"efficiency expert" and "empire builder"—given him by the American prisoners of war.

The defendant was not, however, the kind of traitor who gives his all to the cause of the enemy. He fervently wished Japan would win the war, hoped and believed she would win, but feared she would not. If Japan won, he planned to return to the United states and—as he boasted to American prisoners of war—be a "big shot" because of his knowledge of the language and the people. But in the contingency that Japan might lose, the defendant determined to hold fast to his birthright—his American citizenship.

From March 1943 on to the end the defendant, according to his own testimony, did everything he could to help Japan dominate the struggle. If the aid and comfort resulting from his efforts weighed little in the decision, this is so because his opportunity was limited, and not because his desire to help was slight. The defendant gave to the enemy every aid and comfort he was able to give. He could do no more. Cf. Haupt v. United States, 1947, 330 U.S. 631, 67 S.Ct. 874, 91 L.Ed. 1145.

And the evidence compels the conclusion that what the defendant was able to do, with his brutal, slave-driving tactics, added many tons of nickel ore to Japan's war effort that never otherwise would have been mined or smelted by American prisoners of war. As the Supreme Court observed: "All of the overt acts tended to strengthen Japan's war efforts; all of them encouraged the enemy and advanced its interest." Tomoya Kawakita v. United States, supra, 343 U.S. at page 742, 72 S.Ct. at page 965.

Morally treason is a crime of the mind and heart. [See Hurst, English Sources of the American Law of Treason (1945) Wis. L.Rev. 315.] The traitor's conscience tells him what he is. So it may have been in defiance of a sense of guilt and shame that the defendant asserted his rights as an American citizen soon after the surrender of Japan. Why he wished to return to this

country—this object of his hate—remains his secret.

Whatever the reason, he again swore the American's oath of allegiance, although he admittedly felt none; and procured a passport under the protection of the nation he so recently wished to see prostrate before her enemies. The affidavits he made to procure that American passport show clearly—both by what was said and by what was unsaid—that the defendant returned to our shores fully conscious of his guilt.

There are no degrees of the crime of treason defined in our Constitution. Its common-law counterpart is called "high treason." [See 4 Bl.Comm. *83; Rex v. Joyce, 173 L.T. 377 (1945), aff'd sub nom. Joyce v. Director of Public Prosecutions, 1946 A.C. 347.] Degrees or gradations of a crime are properly based upon differences in state of mind or intent—e. g., homicide. Addington v. United States, 1897, 165 U.S. 184, 17 S.Ct. 288, 41 L.Ed. 679; 1 Wharton, Criminal Law 36, 727–744 (12th Ed. 1932). Traitors such as the defendant are of a single state of mind, having adhered to the enemy. By definition, their treason can be committed with only one intent—to give aid and comfort to the enemy. Cramer v. United States, 1945, 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441.

Some overt acts of treason are by nature exciting and colorful, others dull and drab. This fact gives first-blush support to the contention that the defendant's treason was but of low grade or degree.

All traitors are not given the chance to commit treason in a grand manner. Means to commit the classic type of treason—to betray the United States in a dramatic fashion as did Benedict Arnold—were not available to the defendant. But his testimony at the trial leaves no doubt that he would willingly have blown up our Pacific fleet and disclosed to Japan the secrets of our atom bomb, if it had only been within his power to do so.

Throughout history treason stands as the crime most abhorred by English-speaking peoples—"the highest civil crime which * * * any man can possibly commit * * *." [4 Bl.Comm. *76; United States v. Fries, C.C.D.Pa.1799, 9 Fed.Cas. p. 826, No. 5,126. The traitor has always been considered even worse than a murderer. And the distinction is based upon reason: for the murderer violates at most only a few, while the traitor violates all—all the members of his society, all the members of the group to which he owes his allegiance. The punishment inflicted by the common law—when traitors were publicly dragged to the place of execution and there drawn, quartered and beheaded—recalls the extreme odium which our forebears attached to the crime of betraying one's country. The penalty for murder was death; for treason, death with vengeance. [Pound, Criminal Justice in America, 103 (1945); 4 Bl.Comm. *93.]

Our Constitution provides that: "The Congress shall have Power to declare the Punishment of Treason * * *." U.S. Const.Art. III, § 3, cl. 2. The First Congress exercised this power by declaring without exception that whoever is guilty of treason "shall suffer death." 1 Stat. 112, 1790. And it was not until the Congress confronted the extraordinary vicissitudes of the Civil War that provision was made for the existing alternative punishment of imprisonment and fine in the discretion of the court. [See 12 Stat. 589 (1862); Cong. Globe 37th Cong., 2nd Sess. 2163–2173 (1862); United States v. Greathouse, C.C. N.D.Cal.1863, 26 Fed.Cas. pp. 18, 22–23, No. 15, 254; Hurst, Treason in the United States, 58 Harv.L.Rev. 395, 416–421 (1945); cf. United States v. Fries, supra, 9 Fed.Cas. at pages 908–912.]

So today our law permits the life of a traitor to be spared. And it may be: "It is the essence of treachery that those who commit it would still be severely punished if the law forgot its duty to provide deterrents to crime and did not lay a finger on them." [West, The Meaning of Treason, 229 (1947).]

It may be, if the defendant were to go from this court a free man, he would live out his life in bitter scorn of himself. He might be haunted to the end of his days by the memory not only of his acts of treason against the land of his birth, but also

of Sadao Munimori who won the Congressional Medal of Honor; of Privates First Class Fumitaka Nagato and Saburo Tanamachi, who are buried with other American heroes at Arlington National Cemetery; and the memory of almost seven hundred other boys of like American birthright, of like Japanese parentage, who gave up their lives that America and her institutions might continue to live.

But subjective punishment of the defendant is only one factor. When the inherent nature of treason and the purpose of the law in imposing punishment for the crime are considered, reflection leads to the conclusion that the only use for the life of a traitor is to serve as an example to those who may hereafter be tempted to commit treason against the United States.

Judges may well differ—and with sound reason—as to methods whereby a defendant's life can best serve as a deterrent. Upon affirming the judgment in this case the Supreme Court declared that: "The flagrant and persistent acts of * * * [the defendant] gave the trial judge such a leeway in reaching a decision on the sentence that we would not be warranted in interfering." Tomoya Kawakita v. United States, supra, 343 U.S. at page 745, 72 S.Ct. at page 966.

■ Considerations involving foreign relations which were urged upon oral argument are properly addressed only to the executive department, since the separation of governmental powers provided in the Constitution so decrees. U.S.Const.Art. II, § 2, cl. 2. As the Supreme Court said in United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255: "In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." Cf. Chicago & Southern Air Lines v. Waterman Steamship Corp., 1948, 333 U.S. 103, 111–112, 68 S.Ct. 431, 92 L.Ed. 568; Coleman v. Miller, 1939, 307 U.S. 433, 454–455, 59 S.Ct. 972, 83 L.Ed. 1385.

■ Finally it should also be noted that the President alone is vested with "Power to grant Reprieves and Pardons for Offences against the United States * * *." U.S.Const.Art. II, § 2, cl. 1. "The benign prerogative of mercy reposed in him cannot be fettered * * *." in any case. Ex parte Garland, 1866, 4 Wall. 333, 71 U.S. 333, 380, 18 L.Ed. 366. A fortiori in a case involving the crime of treason against the United States.

The separate functions of the executive and the judicial departments with respect to punishment for offenses against the United States is fully explained in Ex parte United States, 1916, 242 U.S. 27, 41–42, 51–52, 37 S.Ct. 72, 61 L.Ed. 129. The Supreme Court there declared that "the right to relieve from the punishment fixed by law and ascertained according to the methods by it provided, belongs to the executive department." Ex parte United States, supra, 242 U.S. at page 42, 37 S.Ct. at page 74.

Moreover executive clemency, as Mr. Justice Holmes pointed out in Biddle v. Perovich, 1927, 274 U.S. 480, 486, 47 S.Ct. 664, 665, 71 L.Ed. 1161, "is not a private act of grace from an individual happening to possess power. It is a part of the Constitutional scheme. When granted it is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed."

One of the wisest of legal philosophers teaches that a judgment of the court should be determined by "a judicial process carried on by applying a reasoned technique to experience developed by reason and reason tested by experience." [Pound, Justice According to Law, 91 (1951).]

■ When study and meditation at length clear the pathway to decision, no reason of judicial cognizance appears to call for a change in the judgment previously fixed and affirmed.

The motion to modify the sentence is denied.

The defendant has indicated that he will seek executive clemency in the event his motion to reduce the sentence should be denied. For obvious reasons the President should not be required to act under pressure of a fixed date for execution in reaching decision upon the defendant's petition.

[7] Accordingly issuance of a warrant fixing date for execution of the judgment will be stayed for ten days. If a petition for executive clemency is presented within that period and an affidavit of the defendant or his counsel is filed with the clerk of this court so declaring, the period of such stay will be enlarged until five days after the determination of the petition by the President, or until further order of court.