Edward Raymond EGE, Joseph Boyd and Joseph Victor Bruno, Appellants,

v.

UNITED STATES of America, Appellee.

No. 14955.

United States Court of Appeals Ninth Circuit.

April 1, 1957.

Rehearing Denied May 15, 1957.

Walter M. Campbell, Lillie & Bryant, Los Angeles, Cal., Robert B. McMillan, Leo R. Friedman and George T. Davis, San Francisco, Cal., for appellants.

Lloyd H. Burke, U. S. Atty., Richard H. Foster, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before STEPHENS, CHAMBERS and BARNES, Circuit Judges.

CHAMBERS, Circuit Judge.

Ege, Boyd and Bruno have run afoul of the Mann Act.[1] A young California girl who had renamed herself Cindy was their pawn.

As a child through the normal school years, Cindy had been moved from one foster home to another. After nine years of school, she started to work. She was employed as a clerk by three San Francisco concerns, each in rapid succession. She then graduated to the chorus line of the burlesque follies. She seems to have been an habitue of the

1. See 18 U.S.C.A. § 2421 et seq.

Sarong Club in San Francisco. At least in 1953 that club had among its clientele persons like the defendants Ege and Boyd who had commercial use for young women willing to accept their management in the prostitution field.

Ege maintained in San Francisco sort of a supply house of women (of whom Cindy became one) and Boyd and Bruno operated houses of prostitution where and when they could find local law relaxed. Eventually, Cindy and Ege argued. In the vernacular, "they fell out." And that seems to have given the federal agents their chance to make a case.

During her career, Cindy was sent by Ege to Scottsdale, near Phoenix, Arizona, where she worked in Boyd's "house" which operated there awhile. Then she returned to California where she came under the direct control of Bruno at his "house" at Delano, some thirty miles north of Bakersfield. During the end of her circuit she plied her trade a day or two at Las Vegas, Nevada. There had been intermediate stops for her in brothels at Suisun, Sacramento and Barstow, under the aegis of Ege. It is around the necessary crossing of state lines by Cindy that the government found the required "commerce among the states" and thus the applicability of the Mann Act. It asserted that Ege, Boyd and Bruno all had a hand in the operation.

Ege was indicted for transporting Cindy from San Francisco to Scottsdale for the purposes of prostitution. See 18 U.S.C.A. § 2421. A second count charged that Ege, Boyd and Bruno in violation of 18 U.S.C.A. § 371 did conspire together to commit an offense in that they and each of them did conspire in violation of 18 U.S.C.A. § 2421 knowingly "to transport women between California and Arizona and California and Nevada for the purposes of prostitution." The indictment then related a list of fourteen overt acts, mainly incident to shuttling Cindy about the country. There was further amplification of the overt acts in a bill of particulars.

A jury found Ege guilty on the first count which was his alone. On the second or conspiracy count, Ege, Boyd and Bruno were all found guilty. Each was sentenced to five years on the conspiracy charge and Ege was given an additional five years on his single count. Ege's sentences run consecutively.

*The single count against Ege*

Ege's sole claim here concerning the first count is that the evidence of the government only showed that Ege may have "persuaded or induced" Cindy to go to Arizona from San Francisco in violation of § 2422 of Title 18, but that it was not shown that he "caused her to be transported," a violation of § 2421. Reliance is placed upon LaPage v. United States, 8 Cir., 146 F.2d 536, 156 A.L.R. 965. In that case, a woman was on vacation in Minneapolis from her employment as an inmate in a brothel in Fargo, North Dakota. The keeper of the house telephoned her and requested that she return. It was understood that she would resume her old employment in Fargo. The woman returned as requested, but paid her own way. Of course, in a loose sense LaPage did cause the woman to be transported in interstate commerce. But we assume that § 2421 requires a little more "causing" beyond just "persuading and inducing." Here Ege made the arrangements for Cindy with another woman in the trade, one Judy, (or he pointed to the arrangements) who was driving to the same Phoenix-Scottsdale destination. (Judy also was in the group of women controlled by Ege.) Ege gave Cindy $50.00 for her expenses to Phoenix, including share-the-ride expenses with Judy. This seems to have been no different than if he had presented Cindy with a plane or train ticket and told her to go. It is the same as if he handed Cindy the money and had taken her to the ticket window to make the purchase of a transportation ticket to Phoenix. Such conduct goes, we hold, beyond mere persuading or inducing. We hold that when the man puts up the money in advance, when

it is used for the interstate trip by the woman in accordance with his plan, when he has persuaded and induced her to make the trip for the purposes of prostitution, he has also caused the woman to be transported in violation of § 2421. Thus, we distinguish LaPage's case.

*The sufficiency of the evidence against Ege and Boyd on the conspiracy count*

Ege, the small booking agent and manager of prostitutes, operated from a home in San Francisco on which he had assumed the lease of Boyd. Boyd was in Arizona at Scottsdale near Phoenix operating his brothel in September-October, 1953.

■ Ege took the witness stand in defense. Boyd and Bruno did not. They rested when the government closed its case in chief. We think within the limits of Dyer v. MacDougall, 2 Cir., 201 F.2d 265, and Bennett v. United States, 9 Cir., 234 F.2d 675, the jury was entitled to draw many affirmative inferences from the improbabilities of Ege's story. These, when added to the evidence in chief, make hollow any claim by Ege that there was insufficient evidence of conspiracy as to him.

And as to Boyd, we have the following:

1. The fact that before Cindy went with Judy in 1953 to Arizona Boyd and Ege knew each other.

2. Efforts of Ege in September, 1953, to "place" Cindy somewhere.

3. Ege dispatches Cindy, transportation prepaid, to Scottsdale along with the above-mentioned Judy.

4. Boyd at Scottsdale received Cindy and puts her to work for a week or two in the trade at his brothel.

5. Boyd's verbal act at Scottsdale in soliciting customers for his house when he stated that he was bringing over two women from California.

6. The quick appearance thereafter of Cindy at Scottsdale along with Judy straight from Ege's quarters in San Francisco.[2]

7. Evidence that Boyd did make many calls to San Francisco from his motel late in September, 1953, and in October.

8. Boyd's subsequent admissions that he had telephoned Ege at San Francisco from Phoenix or Scottsdale, apparently around the time Cindy was going to and she was working for him in his house at Scottsdale.

Out of the foregoing, the jury was entitled to infer from the circumstances that there a conspiracy had been formed in September, 1953, between Ege and Boyd to transport Cindy to Arizona from California for Mann Act purposes and to infer that it was executed. There is no shortage of evidence of at least one overt act, as charged, and of the commencement of the act in the Northern District of California, and thus proper venue.

*Bruno and the conspiracy*

Bruno appears to have been an old and experienced operator in the brothel field. We have little doubt that as such he probably knew when he ordered a woman from Ege that she would be one whom Ege was shuttling here and there and over interstate lines. We strongly suspect that Bruno made the arrangements with Ege for Cindy to fly from Phoenix to Bakersfield via Los Angeles before she rode with him from Bakersfield to Delano, there to work at her new profession and thus profit Ege and Bruno. But the evidence is just too weak to hold Bruno for a violation of the Mann Act on the record here.

Backtracking for a moment, the evidence amounts to this: Apparently, without Boyd's knowledge,[3] Cindy at Scottsdale in October, 1953, talked on the

---

2. During Cindy's stay at Boyd's "house" in Scottsdale there seem to have been three girls serving the trade there. The origin of one girl is not shown. But Cin-

dy and Judy were "two girls from California."

3. That is, there are no facts in evidence that Boyd knew in advance, or simultane-

telephone to Ege at San Francisco. Ege told her to promptly fly to Bakersfield from Phoenix and to go to work at Delano for Bruno. She followed instructions. Ege directed that when she reached the transfer stop at Los Angeles en route from Phoenix she should telephone Bruno at a Delano number. This she did, but she refused to state positively that she talked to Bruno when she made the call. Upon her arrival at the Bakersfield airport, Bruno meets her in his Cadillac. He takes her to Delano where she works in the trade for him. We only know from evidence inadmissible against Bruno that Boyd and Bruno knew each other. Undoubtedly, Ege and Bruno knew each other.

We think there is a permissible weak legitimate inference that Bruno and Ege had formed a conspiracy. It would have been stronger if Cindy had testified she telephoned and talked to Bruno on the telephone upon arrival at Los Angeles. There is nothing that shows that Bruno ever knew from whence Cindy came to Los Angeles where she made the telephone call to Bruno's number. Cindy was not asked if Bruno knew from whence she came. She was not asked if Bruno said anything indicating he knew she was under Ege's exclusive management, or if Bruno had said anything about arrangements with Ege. Perhaps, it would have been futile to ask. It is obvious that Cindy's testimony disappointed the government. It seems obvious she was scared.

While a conspiracy shown to exist is ordinarily presumed to continue (and it probably did), yet here the strongest inference under the evidence is that the original one started by Ege and Boyd stopped when Cindy left Boyd's place. There is no showing that Boyd helped her on her way to Bruno—no transportation of Cindy to the Phoenix airport on departure or final conversations with Boyd. No witnesses testified to any admissions by Bruno. There just is not enough competent evidence on Bruno as

ously with the telephone call, that Ege was pulling Cindy away from Boyd and sending her to Bruno. If any inference

to the formation of a new conspiracy between Ege and Bruno, or a continuation of the old Boyd-Ege conspiracy. Thus, we do not reach the contentions spinning around the claim that we have here a charge of one conspiracy and proof of two.

*Specifications affecting all conspiracy defendants*

It is specified that the court erred in not instructing the jury that the jurors must all agree on at least one of the overt acts. With much force the defendant Boyd argues, in effect, each juror might have selected his own overt act to the exclusion of others: that the jurors may have "tacked" overt acts without all actually agreeing on any one. At first impression, it seems a powerful argument. We reject it nonetheless.

The jury instructions included:

1. "You must find * * * Fourth, that one of the conspirators [after the formation of the conspiracy] knowingly committed at least one of the overt acts charged in the indictment;"

2. "Since the burden is upon the prosecution to prove the accused guilty beyond a reasonable doubt of every essential element of the crime charged, the defendant has the right to rely upon a failure of the prosecution to establish such proof."

3. "You must consider each count separately as though each was set forth in a separate indictment, and in order to convict or acquit the defendant on any count, you must reach a unanimous verdict as to each count. It will take all twelve of you to convict or acquit, as the case may be, on each count."

4. "It is not necessary, as I have indicated, that all the overt acts charged be proved, but it is necessary that at least one of these be proved and that it be shown to have been in furtherance of the object of the conspiracy. Other overt acts

is permissible it is that Boyd did not know.

than those charged may be given in evidence, but proof of one of those charged in the indictment is indispensable."

One's first impression is that defendant's request for the highly specific instruction on unanimity should have been granted. And it is easy to say, "The requested instruction would be a correct one. Why not give it? It would do no harm."

Yet if each juror selected his own overt act from the list, that would be a misconstruction of the instructions as given. There is no positive insurance against a jury going "haywire." Those of us who believe in the jury system, believe that the jury usually does not get mixed up. We believe the margin for error is less in simple instructions.

■ In the preparation of instructions, it is always a question of balance. If every instruction is granted that is not improper, either at the request of the defense or the government, the skein can get so twisted, snarled and knotted that the opportunity for jury error increases. If sufficient and not wrong, brevity should be a fetish. More even justice will be done when simplicity is achieved, assuming adequacy is accomplished. The requested instruction was proper. We think its refusal was not error; at least not reversible error.

Anent this point, Boyd' has argued that in the absence of an express instruction for unanimity on one overt act there was error in the absence of a special verdict which was not submitted. Above we have given our answer. Akin to this question is Bruno's contention that a special verdict should have been submitted to the jury on the overt acts.

The treason cases of Cramer v. U. S., 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441, and Haupt v. U. S., 330 U.S. 631, 67 S. Ct. 874, 91 L.Ed. 1145 are cited.

First, we can say that the overt act of the crime of treason of Article III, § 3 of the Constitution is a substantial part of the crime. Insubstantial overt acts may qualify to move a garden variety of conspiracy agreement into the zone of crime and away from "talking" and "thinking." Yet such overt acts may fall short of the substance required for a treasonable overt act. Thus, in a way, treason is sui generis.

Second, here no objection was made to the submission to the jury of some overt acts upon which the evidence failed. Really the substantial question for the jury's consideration here was whether a conspiracy existed at all.

Assuming the conspiracy, a claim that there was no overt act is rather hollow. Nonetheless, the defendants were entitled to have the jury (not the trial court, not this court) determine originally the question of the existence of an overt act.

But the court's failure on its own motion (even yet not excepted to) to withdraw certain overt acts from the jury must be viewed in the light of the fact that the proof shows almost conclusively the existence of an overt act.

The Cramer case we do not regard as a harbinger of a holding that conspiracy cases require a special verdict on the overt acts. We believe that the decision there would have been affirmed if there had been sufficient proof for a jury issue on each overt act. Doubtless the submission of each overt act was thoroughly objected to and the objection overruled. Here in Boyd's and Ege's case no objection was made on submitting to the jury the full list of alleged overt acts. Treason is a crime that gets special treatment almost all of the way.

■ At the trial, attorneys (other than those severally representing the defendants now) made their defense mainly on the ground of no conspiracy. Additionally, they offered to the district judge the rejected instruction on unanimity on one overt act. As we have indicated above, we think the instructions as given, properly interpreted, gave the jury this requirement of unanimity. If a defendant does not move for a directed verdict (these defendants did), he is not entitled to a review of the sufficiency of evidence. We think it of far less consequence to a defendant to hold, as we

do here, that it was not error to remove from the jury's consideration some stray overt act, when it was never requested that such be done. Not having requested the withdrawal of certain alleged overt acts, we thus find complaints are made that "unanimity on one overt act was not required" and "there should have been a special verdict." These, we hold to be without merit.

The judgment is affirmed as to Ege and Boyd and reversed as to Bruno.